[Crim. No. 18922. Second Dist., Div. Five. July 24, 1972.]

THE PEOPLE, Plaintiff and Respondent, v.
ACE T. CARTER et al., Defendants and Appellants.

## COUNSEL

Richard H. Levin, under appointment by the Court of Appeal, and Morris Lavine for Defendants and Appellants.

Evelle J. Younger, Attorney General, William E. James, Assistant Attorney General, and Maury W. Corn, Deputy Attorney General, for Plaintiff and Respondent.

## OPINION

STEPHENS, J.—By information, defendants Carter and Witwick, along with two others, were charged in count I with kidnaping (one Ruth Chadwick on January 12, 1968) for the purpose of robbery, in violation of Penal Code section 209; in count II, with robbery (of one Ruth Chadwick on January 12, 1968), in violation of Penal Code section 211; in count III, with burglary (of the residence of one Ruth Chadwick on January 12, 1968), in violation of Penal Code section 459; and defendant Witwick was charged with having been convicted of a prior felony.

Defendants' Penal Code section 995 motions were heard and denied. Defendants were arraigned and pleaded not guilty, and defendant Witwick denied the prior. Defendant Carter's motion to sever for all purposes was granted. Witwick's Penal Code section 1538.5 motion was first denied, reconsidered, and then denied. Carter's Penal Code section 1538.5 motion was denied. The Carter and Witwick actions were then consolidated for trial, without prejudice to any motion to sever. Both Witwick and Carter waived jury, and the court found both to be not guilty of count I, but found both to be guilty of counts II and III, and that the robbery and burglary in the respective counts were in the first degree. The court also found that the prior charged against Witwick was true.

Defendants' motions for new trials were denied, and probation was denied as to each. Both were sentenced to the terms prescribed by law as to counts II and III, with the sentences to run concurrently. Defendant Carter's sentences were to run consecutively to another unrelated sentence that he was already serving. The sentence of each defendant on

count III was stayed pending any appeal and during service of any sentence pronounced by the Adult Authority as to count II, the stay to become permanent upon completion of any sentence served on count II. Each defendant appeals from the judgment rendered against him.

The record on appeal is voluminous, and we set forth only those facts which are material to the issues raised by the appeals of Carter and Witwick.

The events constituting the offenses for which defendants were convicted occurred on January 12, 1968, but since certain evidence obtained as early as July 1967 was of importance in the motion to suppress other evidence, we include the pertinent facts relating to the 1967 evidence in the statement of facts: In July 1967, one Barfield of the Long Beach Police Department was informed by another member of his department that defendant Carter was suspected of defrauding an innkeeper. The victim was interviewed, and in the course of that investigation Barfield was told that a nickel-plated revolver with a black handle had been observed in Carter's room at the Don's Motel on East Pacific Coast Highway. Prior to interviewing the victim of the alleged defrauding, Barfield knew that Carter was a subject listed in a 1965 booklet of the Western States Safe Burglary Conference. Barfield had indexed every subject listed in the booklet (there appear to be two booklets: 1965 and 1966) and incorporated them in his file. One of the facts learned therefrom was that Carter at times would be armed. In the instant case, defendants had a subpoena duces tecum issued for the booklet, and the prosecution moved to vacate the subpoena on the ground of confidentiality of the information. The booklet constituted a composite synopsis of the exchange of police information at the 16th and 17th annual Safe Burglary Conference held by members of law enforcement agencies, and was not for general public use. The trial judge vacated the subpoena, though he permitted defense counsel to read those portions of the booklet relative to defendant Carter which were relied upon by the prosecution to establish probable cause on the part of Barfield.[1]

---

[1]The material portions state: "We are going to be talking about a group that are located mainly in Las Vegas; they live there, however, they are no longer operating in Vegas. They are good safe mechanics, two of them are former locksmiths, and one of the group is a terrific burn man. We would see them leaving town; they would go out on a weekend. We would send for teletypes, then we would see quite a few of these super-market safe burglary burn jobs coming in on the teletype and quite a few of them were Safeway Store jobs. Wally Horan from Denver had some Safeway jobs and he sent requests for photographs which we sent, and he got three of the group identified as being in Denver at that time. So, we feel pretty certain that they are the ones that are hitting the super-markets, burning these safes. This is one of the best burn jobs I've ever seen.

"This is TERRY ACE MCCARTER [the same person as defendant Carter]. He's trying

On October 11, 1967, a member of the Norwalk Sheriff's Department informed Barfield's superior, and the information was related to Barfield, that a telephone company lineman, while in the process of a line test, had intercepted a telephone conversation concerning an impending burglary. The conversation was between a man and a woman, and the telephone at the Long Beach end of the conversation was listed to Patricia Carter, at 4720 Atherton, Apartment 14. Currency, jewelry and coins were expected to be obtained as a result of the burglary. Barfield subsequently learned that a burglary had occured in Anaheim the weekend following the intercept, in which the items taken were similar to those listed in the phone conversation. The Anaheim police were contacted, and the information was relayed to Barfield (through a member of the Long Beach Police Department who talked to the Anaheim department) that Carter was living at the Atherton Street address. On November 8, 1967, Barfield commenced a surveillance of Carter, starting at 4720 Atherton. Carter was seen to enter and leave apartment 14 at that address from time to time. Also, Carter was seen in the company of other persons from Las Vegas who had been referred to in other portions of the conference booklet (not set forth in fn. 1). Carter was seen to be driving a Cadillac. On November 12, 1967, Carter was seen in the company of other persons and, to summarize the events observed, to be casing the Longhorn Cafe. After the closing hour

---

to act like a poor boy. He doesn't want us to know that he has any money. He had a '55 Oldsmobile that he had repossessed, tried to fake it, but then he goes out and pays cash for a Lincoln Continental. He paid off a thousand dollars in credit cards and ordered a new Cadillac from the coast, such things as this. . . . We have two pictures of him, one without and one with the beard. I'm going to give you the vehicle information, but because they change cars so rapidly, by the time the transcript comes out these vehicles may not be worth anything. Right now, he's driving this Lincoln Continental four-door hardtop, maroon in color, Nevada license C62000. He also has a '60 Ford Falcon pickup; it's light blue with Nevada license CT895 and a '60 Buick convertible, white with Nevada license C104894. Now, as I say, they change these quite rapidly."

"M.O.: McCARTER [defendant Carter] was a locksmith and is a good safe mechanic. Seems to prefer roof and rear door entries. He is able to punch, peel or burn. Travels all over the western United States. Has been known to buy keys and combinations from locksmiths. Makes key entry, opens safe and then phonys up the scene to make it appear forced. Known to go armed. Likes to brag about how tough and smart he is."

"The following information was presented by Hashim Hanief, Las Vegas Sheriff's office: An old-timer to the transcript which has been in each one for the past few years is TERRY GENE McCARTER. He is known better as ACE, uses the last name of CARTER also. He's self-employed, says he sells furniture after he steals it. He's also a carpet layer, which he lays after he steals that. We had a report he was married, but the romance is on the rocks; he spent all his wife's money."

"He is a good locksmith; he picked it up just by hanging around them; he has a knack for obtaining keys. On occasion he will pick up the combination, gets into the place, then phony up the safe so it will look like he got in there on his own. He will punch, peel or burn."

for the cafe, Carter was seen to be in its general vicinity, and then not observable. Since the Longhorn Cafe was in the Los Angeles Sheriff's jurisdiction, information to the effect of a possible burglary at that location was transmitted to that law enforcement agency. A Sheriff's helicopter arrived over the cafe, and at the same time Carter was seen to open the cafe door and look outside, then jump back inside. Carter had a gun. After the use of tear gas, the police entered the Longhorn and found one man, but did not find Carter. The police then went to Carter's apartment and knocked on the door but received no response.[2] The police could hear voices coming from within the apartment. The police then obtained a key to Carter's apartment from the apartment manager, but the key would not open the door. The police then forced the door open. Carter's wife was the only person in the apartment, and the sound of voices which the police had heard had apparently come from a television set which was operating in the apartment. While in the apartment, however, the police observed a small spiral binder notebook (hereinafter, the notebook) lying "on the dresser [or] on the nightstand next to the bed."[3] The police seized the notebook for the reason that they believed that it might "lead . . . to Carter."[4] The notebook was found to contain certain names and addresses, and evidence was later adduced which tended to show that the writing in the notebook was that of Carter. Carter was not apprehended at that time. One of the names in the notebook was "Fred Chadwick." The police subsequently interviewed Fred Chadwick in regard to the appearance of Chadwick's name in Carter's notebook. Chadwick denied being acquainted with Carter, and told the police he had no explanation for the appearance of his name in the notebook.

In early January 1968, Barfield, in the process of further investigation, talked to various persons whose names were found in the notebook, in

[2]It is admitted that the police had no warrant. There was police testimony to the effect that the police made a Penal Code section 844 demand and explanation for admittance, but this testimony was "discounted" by the court. The court did, however, rule that such an announcement was not necessary because the police "had a perfectly reasonable belief that announcing their purpose could well have endangered their lives. . . ."

[3]There was police testimony to the effect that Carter's wife had consented to a search of the apartment. Carter's wife denied giving her consent, and the court ruled that any consent, if given, "was a submission to authority, and it was not a free and voluntary consent."

Carter's wife also testified that the notebook was not taken from the nightstand or dresser, but from the pocket of a shirt that had been hanging in the closet. The court, however, chose not to believe her testimony.

[4]The court upheld the seizure of the notebook on the ground that the police could have reasonably believed that the contents of the notebook might "lead them to other locations where the defendant might be apprehended."

addition to Chadwick, and none of them knew how or why their names appeared there. On January 10, however, a Mr. Pateras, one of those named in the notebook, told Barfield that he had been contacted by Carter, who had called upon him purportedly to see about selling Pateras some silver certificates. On January 21, 1968, Barfield was sent to the Chadwick home to investigate the crimes which had occurred there that day. He learned that Mrs. Chadwick had been taken into custody by two masked men wearing shop coats and ski masks. She had had a pillowcase placed over her head and had been left handcuffed and tied in the bathroom, where Mr. Chadwick ultimately found her. She gave other physical descriptions of the men, and stated that one of the men was called Dan or Don. At least two handguns were reportedly missing (one, a German Luger), along with $40 to $50; the rug which covered a floor safe in a closet, as well as other items which had been on the rug, had been moved into another room. The safe had not been opened. Barfield also learned, from a neighbor of the Chadwicks, that her yardman had observed a white Continental with two men in it, in the area of the Chadwick home on several occasions on the previous day, and that the neighbor herself had seen the vehicle on one occasion. Another neighbor had seen a light-colored car in the vicinity at the approximate time during which the crimes had occurred. Barfield formed the opinion that the crimes had been set up by Carter. Barfield then drove to the area of the Carter apartment. Upon arriving in the close vicinity of Carter's apartment building, the police observed a white Continental parked in front of the building, directly behind a Cadillac automobile that was known to the police to belong to Carter. After watching the cars for approximately one hour, the police observed Carter, Witwick and two others walk out of the apartment building. Witwick and the two others were seen to get into the Continental, and the Continental was then driven to the apartment's rear parking area, where it was stopped next to a Pontiac automobile, while Carter was seen to walk toward the same parking area. The police then observed the transferring of items from the trunk of the Continental to the trunk of the Pontiac. The Continental was then driven out of the apartment parking area and onto the street, where it was stopped by the police. Witwick and the two others (not Carter) were taken from the Continental and arrested, and the Continental was searched. The search revealed, among other things, a walkie-talkie, a lock pick, binoculars, an ammunition clip containing ammunition, other ammunition, a holster, an 18″ pry tool, three suitcases, and an FM radio which was tuned into Long Beach Police Department broadcasts. The arrest of those in the Continental took place on January 12 at approximately 11 p.m. They were promptly transported to the Long Beach police station, and Barfield went in a separate car to the

detective bureau at the police station. He thereafter returned (at approximately 1:30 a.m. on January 13) to the area of Carter's apartment to search further for Carter. Carter was arrested about a half hour later in a neighbor's apartment. The Pontiac, which had been under constant police surveillance since the time of the observed transfer of the items from the trunk of the Continental to the trunk of the Pontiac, was then searched. The search of the Pontiac produced acetylene torch burning equipment, a crowbar, a pry bar and punch, an electric drill, a jackhammer and bits, pliers, ski masks, shop coats, false mustaches and sideburns, gloves, walkie-talkies, and pistols and ammunition. Evidence was later adduced that tended to show that one of the pistols discovered in the Pontiac was taken in the Chadwick burglary, and that the ski masks discovered in the Pontiac were similar to those worn by the Chadwick burglars.

On appeal, both defendants contend that the telephone intercept was illegal. In addition, both contend that *all* evidence discovered subsequent to the intercept was the "fruit" of the intercept and, therefore, should have been suppressed. In support of these contentions, defendants assert that the intercept was taken in violation of: (1) their constitutional rights to be free from unreasonable searches and seizures; (2) title 47, United States Code section 605; and (3) California Penal Code section 631.

We need not discuss whether or not any illegality was involved in the intercept because we disagree with the thrust of defendants' contentions, i.e., that all evidence discovered subsequent to the intercept was the illegal "fruit" of that intercept. "The 'fruit of the poisonous tree' doctrine—distilled from a number of decisions of the high court and articulated in *Wong Sun* [v. *United States,* 371 U.S. 471 (9 L.Ed.2d 441, 83 S.Ct. 407)]—rests upon the fundamental thesis that the 'exclusionary rule had traditionally barred from trial physical, tangible materials obtained either during or as a *direct result* of an unlawful invasion.' " (*People* v. *Superior Court (Casebeer),* 71 Cal.2d 265, 271 [78 Cal.Rptr. 210, 455 P.2d 146]; italics added.) The "apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made had been come at by exploitation of that illegality *or* instead by means sufficiently distinguishable to be purged of the primary taint.' " (*Wong Sun* v. *United States,* 371 U.S. 471, 488 [9 L.Ed.2d 441, 455, 88 S.Ct. 407]; italics added.) "In considering whether acts occurring between the unlawful activity and the securing of the evidence objected to are sufficient to purge the taint, courts have held that the decisive issue is not that the road from the unlawful search to the [evidence ultimately seized] is 'long,' but that it is 'straight.' " (*People* v. *Johnson,* 70 Cal.2d 541, 548 [75 Cal.Rptr. 401, 450 P.2d 865, 43 A.L.R.3d 366].) "That

degree of 'attenuation' which suffices to remove the taint from evidence obtained directly as a result of unlawful police conduct requires at least an *intervening independent act by the defendant* or a third party which breaks the causal chain linking the illegality and evidence in such a way that the evidence is not in fact obtained 'by exploitation of the illegality.' " (*People* v. *Sesslin,* 68 Cal.2d 418, 428 [67 Cal.Rptr. 409, 439 P.2d 321]; italics added.)

In the case before us, the intercept did not lead "straight" to the evidence ultimately seized. There was independent and unrelated information from a different police agency as to Carter's residence, and this information was the first to confirm the fact that, though the phone was registered to Patricia May Carter at the Atherton address, Carter also lived there. There was also the "intervening independent act by defendant" Carter of burglarizing the Longhorn Cafe. As stated in *People* v. *Sesslin, supra* (at p. 428), "the causal chain linking the illegality [was broken] in such a way that the evidence [was] not in fact obtained 'by exploitation of [the] illegality.' " (Cf. *Krauss* v. *Superior Court,* 5 Cal.3d 418, 422-423 [96 Cal. Rptr. 455, 487 P.2d 1023].)

■ We also disagree with defendants' contention that the taking of the notebook from Carter's apartment on November 13, 1967 constituted an unlawful search and seizure, and, as a consequence, all evidence contained in the notebook, and all fruit of the evidence contained in the notebook should have been suppressed. The police went to the door of Carter's apartment because they were in pursuit of Carter. Since the police were in pursuit, no search warrant was necessary (*Warden* v. *Hayden,* 387 U.S. 294 [18 L.Ed.2d 782, 87 S.Ct. 1642]), and since the police were reasonable in believing that Carter was armed and dangerous, no Penal Code section 844 demand and explanation for admittance was necessary (*People* v. *Bradley,* 1 Cal.3d 80 [81 Cal.Rptr. 457, 460 P.2d 129]). Once the police were lawfully within Carter's apartment, they seized the notebook because they "felt it might lead . . . to Carter." Since the police "could properly look through the apartment for anything that could be used . . . to expedite the pursuit" (*People* v. *Gilbert,* 63 Cal.2d 690, 707 [47 Cal. Rptr. 909, 408 P.2d 365]),[5] then neither the notebook, nor any other evidence seized, was the product of an unlawful search.

[5]In *Gilbert* v. *California,* 388 U.S. 263 [18 L.Ed.2d 1178, 87 S.Ct. 1951], the United States Supreme Court overturned certain "right to counsel" rulings of *People* v. *Gilbert, supra,* but except for the following statement in the appendix to its opinion, declined to review the *People* v. *Gilbert* "right to search to expedite pursuit" rule: "Assuming that the warrantless entry into the apartment was justified by the need immediately to search for the suspect, the issue remains whether the subsequent search was reasonably supported by those same exigent circumstances. [(1)] If the [evidence] were come upon in the course of a search for the suspect, the answer might be different from that [(2)] where it is come upon, even though in

■ Defendants next contend that the warrantless search of the Continental was unlawful, and, therefore, all evidence seized as a result of the search should have been suppressed. We disagree. Whenever "search and seizure without a warrant are made upon probable cause, that is, upon a belief, reasonably arising out of circumstances known to the seizing officer, that an automobile or other vehicle contains that which by law is subject to seizure . . ., the search and seizure are valid." (*Carroll* v. *United States,* 267 U.S. 132, 149 [69 L.Ed. 543, 549, 45 S.Ct. 280]; see also *Chambers* v. *Maroney,* 399 U.S. 42 [26 L.Ed.2d 419, 90 S.Ct. 1975]; *Mozzetti* v. *Superior Court,* 4 Cal.3d 699 [94 Cal.Rptr. 412, 484 P.2d 84]; *Agar* v. *Superior Court,* 21 Cal.App.3d 24 [98 Cal.Rptr. 148].) The fact of the known association of Carter with the persons in the white Continental automobile, the observation of the transfer of items from the trunk of the Continental to the trunk of the Pontiac (which was observed to have Nevada license plates) in the parking lot located in the rear of Carter's apartment, plus the fact that two of the three men who were observed accomplishing the transfer of the items and then leaving in the Continental fit the general description of the men who had been involved in the Chadwick burglary, provided probable cause to believe that the occupants of the Continental were the perpetrators of the Chadwick burglary. The arrest of the occupants under such circumstances gave rise to the right to search the vehicle. (*People* v. *Superior Court (Simon),* 7 Cal.3d 186, 201

plain view, in the course of a general, indiscriminate search of closets, dressers, etc., after it is known that the occupant is absent. [(3)] Still different considerations may be presented where officers, pursuing the suspect, find that he is absent from the apartment but conduct a limited search for suspicious objects in plain view which might aid in the pursuit." (*Id.,* at pp. 274-275 [18 L.Ed.2d at p. 1187]; the bracketed number-designations are inserted by us for convenience in correlation in our discussion which follows.)

Although the United States Supreme Court recognized the distinction between these three possibilities, it declined to make any declaration as to their validity. California, however, has made declarations as to the validity of each. In *People* v. *Gilbert,* the California Supreme Court held that both possibility (1) ("officers . . . looking through the apartment for their suspect . . . could properly examine suspicious objects in plain sight,") (at p. 707) and possibility (3) (officers "could properly look through the apartment for anything that could be used to . . . expedite the pursuit") (at p. 707) are lawful.

In *People* v. *Marshall,* 69 Cal.2d 51, 59-60 [69 Cal.Rptr. 585, 442 P.2d 665], however, the California Supreme Court, quoting from *Gilbert* v. *California,* ruled that possibility (2) (" 'indiscriminate search . . . after it is known that the occupant is absent,' ") (at pp. 59-60) was unlawful. We believe that the case before us is an example of possibility (3) (search to expedite pursuit), and since the California Supreme Court has declared the validity of such a search, we are constrained to abide by that declaration.

■

[101 Cal.Rptr. 837, 496 P.2d 1205].) In the instant case, we believe that the police had ample reason to believe that the Continental may have contained evidence of the Chadwick burglary, and therefore the warrantless search was justified.

■ Defendants contend that the warrantless search of the Pontiac was unlawful and that the evidence seized as a result of its search should have been suppressed. We cannot agree. At the time that the police, in effect, took the Pontiac into custody, they reasonably believed that it contained evidence of the Chadwick burglary. In *Chambers* v. *Maroney,* 399 U.S. 42 [26 L.Ed.2d 419, 90 S.Ct. 1975], in upholding a warrantless search of an automobile at a police station house, the court stated (at p. 52, fn. 10 [26 L.Ed.2d at p. 429]): "It was not unreasonable in this case to take the car to the station house. All occupants in the car were arrested in a dark parking lot in the middle of the night. A careful search at that point was impractical and perhaps not safe for the officers. . . ." At the time that the police arrested the men in the Continental, Carter was still at large. Since the police could reasonably assume that Carter would have access to the Pontiac, and since Carter was known to sometimes be armed, it was completely reasonable for the police to continue the search for Carter and simply keep the Pontiac under surveillance until the time of Carter's arrest. The delay was not unreasonable. "The probable-cause factor still obtained ; . . and so did the mobility of the car unless the Fourth Amendment permits a warrantless seizure of the car and the denial of its use until a warrant is secured. In that event there is little to choose in terms of practical consequence between an immediate search without a warrant and the car's immobilization until a warrant is obtained." (*Id.,* at p. 52 [26 L.Ed.2d at p. 429].) ■ While the police are not privileged to "inventory" an automobile simply because it is in their custody (*Mozzetti* v. *Superior Court,* 4 Cal.3d 699 [94 Cal.Rptr. 412, 484 P.2d 84]), custody alone does not invalidate a warrantless search so long as the police have probable cause to believe that the automobile contains either contraband or evidence of a crime (*Chambers* v. *Maroney, supra,* 399 U.S. 42).

■ Defendants contend that "the prosecution knowingly used perjured testimony" against them, and, as a result, their convictions must be overturned as being in violation of the rule announced in *Mooney* v. *Holohan,* 294 U.S. 103 [79 L.Ed. 791, 55 S.Ct. 340, 98 A.L.R. 406]. We disagree. In *Mooney,* the defendant had charged "that the sole basis of his conviction was perjured testimony, which was knowingly used by the prosecuting authorities in order to obtain that conviction, and also that these authorities deliberately suppressed evidence which would have impeached and

refuted the testimony thus given against him." (*Id.,* at p. 110 [79 L.Ed. at p. 793].) Assuming defendants' claim to be true, "[s]uch a contrivance by a State to procure the conviction and imprisonment of a defendant is as inconsistent with the rudimentary demands of justice as is the obtaining of a like result by intimidation." (*Id.,* at p. 112 [79 L.Ed. at p. 794].) In the instant case, however, defendants attempt to show a violation of the *Mooney* rule by pointing out certain minor inconsistencies in police testimony, and by offering the following statement made by the judge in Carter's Penal Code section 1538.5 hearing: "I am not too impressed by Officer Barfield anyway. I think that if he hadn't been a police officer and had testified the way he did, that I probably would have referred him to the District Attorney for an investigation as to perjury in the proceeding right before me because I think his conduct there was absolutely reprehensible and I don't like it one bit." This proffer of evidence, however, falls far short of showing that there was perjured testimony, or that, if there was perjured testimony, it was knowingly used by the prosecution, or that, if there was perjured testimony knowingly used by the prosecution, it was a cause of defendants' conviction. As a result, their contention must fail.

■ Defendants contend that it was error to allow the prosecution to use "information from the Western States Burglary Conference Manual [to establish] probable cause for the surveillance of appellant Carter prior to the Longhorn burglary" without first allowing defendants an inspection of this manual. In opposition to defendants' contention, the People contend that since defendants were allowed to inspect "all relevant portions of the manual upon which the police acted," then defendants cannot complain of not being allowed to inspect other portions of the manual not relevant to them. While the contents of the Western States Safe Burglary Conference Manual may well have been hearsay and unreliable, in determining the part that information played in the probable cause to investigate and ultimately arrest defendants, it must be viewed in the light of corroborative facts giving rise to greater expectation of the truth contained in that manual. The manual itself need not be relied upon to establish any reason for surveillance or arrest once the Longhorn Cafe was burglarized; therefore, if the court's ruling was error, which we do not hold, it was harmless beyond doubt.

■ Carter next contends that he was denied "due process of law" because of the introduction of certain evidence pertaining to the burglary of the Longhorn Cafe. In particular, Carter contends that this evidence was introduced "solely for the purpose of showing bad man status." We disagree. The trial judge, in ruling on the admissibility of the Longhorn evidence, made the following statement: "The court at this time will rule that

the Longhorn burglary is inadmissible insofar as the attempts to show common design and so on . . . . Any evidence coming out of the Longhorn crime, which helped to establish evidence which is now in this Court here and which is received in evidence as a result of the search and seizure is staying in evidence; and my ruling does not affect that in any way." We believe that this statement makes it clear that the court did not consider the evidence in question for the purpose of determining Carter's guilt or innocence as to the crimes charged, but, instead, used the evidence for the sole purpose of establishing a foundation for the evidence later seized at Carter's apartment.

■ Carter next contends that it was error for the court to refuse to allow him to introduce evidence in order to attempt to prove that the police had a "modus operandi" for unlawful searches and seizures. We disagree. We have concluded that no unlawful search or seizure took place in this case, and whether such a "modus operandi" does or does not exist is immaterial.

■ Carter contends that the trial court erred in refusing to grant his motion to force the prosecution to elect between prosecuting him as "an aider and abettor" or as a "physical perpetrator." We disagree. Carter was being prosecuted as a *principal* in certain crimes that were alleged to have taken place at the Chadwick residence. *Aiding and abetting* and *directly committing* are simply two of the various means of qualifying as a principal in a crime. (Pen. Code, § 31.) Defendant Carter has cited us no authority for the proposition that the People are under a compulsion to elect one of these means to the exclusion of all others.

■ Defendant Witwick contends that there existed no probable cause for his warrantless arrest. We disagree. We have already concluded that there existed probable cause for the police to believe that the Continental in which Witwick was arrested may have contained items taken during the Chadwick burglary. We also believe that under the circumstances the police had probable cause to believe that the persons riding in the Continental would have knowledge of both the presence and of the stolen character of those items.

■ Defendant Witwick next contends that his "pre-trial lineup was unfairly conducted . . . ." If one of Witwick's assertions in this regard is that he was not represented by counsel at the time of the lineup, it is unfounded. A police officer who was present at the lineup testified that Witwick was represented at the lineup by an attorney by the name of Hunt. Witwick's counsel at trial, at one point, informed the court that "we may

have occasion to put on Clarence Hunt, who was representing Mr. Witwick at the lineup . . . ."

Witwick does make it clear, though, that he believes that the lineup was unfairly conducted. Specifically, Witwick complains that it was unfair to include himself, Carter, and the two other men arrested along with Witwick, all within the same seven-man lineup. The trial court concluded that such a lineup, in itself, is not unfair. We agree.

Defendant Witwick further contends that "[u]se of testimony regarding the fact that [he] did not wish to attend the lineup (no attorney present and no *Miranda* [v. *Arizona,* 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602]] warnings given) was prejudicial error." We cannot agree. The record is clear that Witwick's statement to the effect that he did not want to participate in a lineup was voluntary, and was not in response to any question by the attending officer. "The statement was volunteered and gratuitously interjected during a conversation between police officers under circumstances which could not be construed as an attempt to elicit information from defendant. The *Miranda* warning is required only as to statements of a suspect in response to custodial interrogation." (*People* v. *Siegenthaler,* 7 Cal.3d 465 [103 Cal.Rptr. 243, 499 P.2d 499].)

Defendants' final contention is that there was insufficient evidence to support their convictions. We disagree. Although much of the People's evidence was circumstantial, "[i]t is clear . . . that the lack of eyewitnesses and of direct evidence . . . do not by themselves render the finding of guilt invalid for the lack of evidentiary support. The People, of course, may rely on circumstantial evidence to connect the defendant with the commission of the crime charged and to establish beyond a reasonable doubt that he committed it. [Citations.] An appellate court must view the evidence in the light most favorable to respondent and presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citations.] ' "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also be reasonably reconciled with a contrary finding does not warrant a reversal of the judgment." ' [Citations.] The test on appeal is whether substantial evidence supports the conclusion of the trier of fact, not whether the evidence proves guilt beyond a reasonable doubt. [Citation.]" (*People* v. *Reilly,* 3 Cal.3d 421, 424-425 [90 Cal.Rptr. 417, 475 P.2d 649].)

The facts as heretofore set forth at length establish that there was substantial evidence to support the convictions of both Carter and Witwick.

The judgments are affirmed.

Kaus, P. J., and Cole, J.,* concurred.

A petition for a rehearing was denied August 10, 1972, and appellants' petitions for a hearing by the Supreme Court were denied September 20, 1972.

*Assigned by the Chairman of the Judicial Council.