[Crim. No. 20393. Mar. 21, 1979.]

THE PEOPLE, Plaintiff and Respondent, v.
RAYMOND DEMETRIO ESCUDERO, Defendant and Appellant.

**COUNSEL**

Deidra Griffiths, under appointment by the Supreme Court, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, James T. McNally and Susan Rankin Bunting, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

MOSK, J.—Defendant was charged by information with first degree burglary. (Pen. Code, §§ 459, 460.) After his motion to suppress the evidence under Penal Code section 1538.5 was denied, he entered a plea of guilty and a judgment of conviction was pronounced. In this appeal he challenges only the trial court's adverse ruling on his motion to suppress (Pen. Code, § 1538.5, subd. (m)), claiming that his arrest was illegal and the evidence seized incident thereto must be excluded.

It is conceded that defendant was arrested without a warrant inside his place of residence. In *People* v. *Ramey* (1976) 16 Cal.3d 263, 275-276 [127 Cal.Rptr. 629, 545 P.2d 1333], we held that such an arrest is unreasonable per se in the absence of (1) consent to enter or (2) exigent circumstances. The People invoke both justifications, and the record supports the latter. The judgment must therefore be affirmed.

■ ■■■  The facts are undisputed, and their chronology is important to our resolution of the points at issue.[1]

At 12:40 a.m. on the night in question defendant was surprised in the act of committing a burglary in the home of Mrs. Nancy Lane in the town of Elk Grove, a community in Sacramento County. He was discovered by Stephen Gage, a guest in the Lane home; defendant immediately ran from the house, and Gage began the chase on foot. Defendant then entered an older model maroon Pontiac and drove off, and Gage followed closely in his own car. After turning a few corners, defendant brought the Pontiac to a stop, jumped out, and ran behind the Native Sons Hall. Gage chased defendant around the building in his car, but finally lost sight of him. Gage then attempted to disable the Pontiac by letting the air out of a tire, but soon abandoned the idea as impractical. Instead he took the car's registration card, drove back to the Lane home,

---

[1]The facts are taken solely from the transcript of the hearing on the motion to suppress. The transcript of the preliminary examination was not offered into evidence at that hearing, and the trial court therefore correctly declined to rely on it.

and telephoned the sheriff. In that call Gage gave the dispatcher the information on the registration card and described defendant as being a male of small or medium build, about five feet eight inches in height, with black hair, and wearing an unusual striped shirt.

At 12:53 a.m. Deputy Sheriffs Dillon and Dixon, on patrol in their radio car, received a message advising them of the burglary. They drove to the Lane home, arriving within five minutes. After taking Gage's description of the events they went directly to the Native Sons Hall but the Pontiac had gone. They reported this fact over the radio and requested additional sheriff's units to search the area. In the meantime, however, the dispatcher had transmitted the registration information to the Department of Motor Vehicles and learned the Pontiac had recently been sold to defendant Escudero, whose address was given as a ranch on Sloughhouse Road. The dispatcher broadcast this fact over the radio; Officers Dillon and Dixon received the broadcast, and immediately proceeded towards the ranch.

At 1:25 a.m. the dispatcher also telephoned the owners of the ranch, Mr. and Mrs. Perham, and verified that defendant worked there and owned a maroon Pontiac. Mrs. Perham first told the dispatcher that defendant was not home; but her son, who was also on the line, corrected her and informed the police that defendant had returned to the ranch. Upon request, Mrs. Perham gave a physical description of defendant, and it matched that of the burglar furnished by Gage. Following the telephone call Mrs. Perham noticed that defendant's Pontiac was indeed parked at the ranch.

Within 10 or 15 minutes thereafter—i.e., by 1:40 a.m. at the latest—three sheriff's cars with a total of six officers arrived at the Perham ranch. There were two residences on the property, a large house occupied by the Perhams and a separate dwelling known as the foreman's house where defendant lived. The officers explained to Mr. Perham that defendant was suspected of committing the Lane burglary. Perham promptly entered the foreman's house, told defendant that sheriff's deputies were there and wanted to talk to him, then returned outside and said to the officers, "Ray is dressed, go on in." He held the door open for the officers, and they entered immediately without asking defendant's consent.

The officers found defendant seated in the front room of the house, wearing the same distinctive shirt that Gage had seen on the burglar.

They advised defendant of his rights, questioned him for a few minutes, then placed him under arrest.

I

■ The People contend that the warrantless entry by the deputy sheriffs into the house occupied by defendant was justified by the consent thereto given by Perham. There is no doubt Perham thought that the mere fact he owned the foreman's house gave him the absolute right to invite anyone he pleased to enter it, including the police.[2] The question, however, is not what Perham thought, but whether the officers reasonably and in good faith believed that Perham in fact had the authority to consent to their entry into the foreman's house. (*People* v. *Carr* (1972) 8 Cal.3d 287, 298 [104 Cal.Rptr. 705, 502 P.2d 513], and cases cited.) The burden of proving that belief is on the People (*People* v. *Roberts* (1956) 47 Cal.2d 374, 377 [303 P.2d 721]), and they failed to sustain it in the case at bar.

The burden could have been discharged by the introduction of "objective evidence" that Perham had "joint control [of] or access to the places or items to be searched" (*People* v. *McGrew* (1969) 1 Cal.3d 404, 412 [82 Cal.Rptr. 473, 462 P.2d 1]), i.e., by showing that Perham and defendant were both living in the foreman's house at the time. The record, however, is otherwise. Although the Perhams had lived in the foreman's house while the main ranch house underwent remodelling, several days before these events they had moved back into the latter: Perham testified that on the night in question "We were living in the house we remodelled." On the other hand, Perham agreed on cross-examination that since he and his wife had moved out, defendant had been "actually residing in the foreman's house" and "had his clothes there and he stayed there." In these circumstances Perham was not a joint occupant of the foreman's house within the meaning of the rule here in issue.

Moreover, the true relationship of the parties appeared when Perham further admitted on cross-examination that defendant's right to reside in the foreman's house "was part of the arrangement [I] had with him as an

[2]Thus Perham testified on direct examination:
"Q. Was the second building, the foreman's house, also your property? A. That is correct.
"Q. You had complete control over that building, is that correct? A. That is right.
"  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .
"Q. Did you give [the police] consent to enter that building? A. I certainly did."

employee." In other words, as part of the compensation for his labor defendant was allowed to live on the property in housing owned by his employer, and the latter in turn agreed to accept a portion of that labor in lieu of rent. This type of landlord-tenant relationship is not uncommon between agricultural employers and farmworkers in California.    (3) The issue is whether the relationship is exempted from the general rule that a landlord has no authority to consent to a police entry of premises occupied by a tenant.

As it has developed in the cases, the rule is as broad as necessary to protect the privacy interests at stake. To begin with, the principle does not turn on the character of the demised premises: it applies not only when the tenant leases an entire detached house (*Chapman* v. *United States* (1961) 365 U.S. 610, 616-617 [5 L.Ed.2d 828, 833-834, 81 S.Ct. 776]), but also when he rents an apartment (*People* v. *Roberts* (1956) *supra,* 47 Cal.2d 374, 377), an enclosed garage (*People* v. *Verbiesen* (1970) 6 Cal.App.3d 938, 942-943 [86 Cal.Rptr. 320]), or a storage locker in a bowling alley (*People* v. *Baker* (1970) 12 Cal.App.3d 826, 836 [96 Cal.Rptr. 760]). Nor does the rule depend on the duration of the tenancy: it applies both to a long-term lessee and to a transient guest who takes a room, however briefly, in a hotel (*Stoner* v. *California* (1964) 376 U.S. 483, 488-490 [11 L.Ed.2d 856, 860-861, 84 S.Ct. 889]; *People* v. *Burke* (1962) 208 Cal.App.2d 149, 160-161 [24 Cal.Rptr. 912]) or a motel (*Krauss* v. *Superior Court* (1971) 5 Cal.3d 418, 422 [96 Cal.Rptr. 455, 487 P.2d 1023]).[3] By parity of reasoning, the rule is unaffected by the nature of the consideration given for the right to occupy the premises: it applies whether the tenant pays in money, as in the above-cited cases, or in services, as here—or indeed whether his occupancy is permitted for any reason deemed sufficient by the owner. In each of the foregoing instances the owner voluntarily gives up the right to occupy the premises for the period of the tenancy, and the tenant in turn acquires a legitimate expectation of privacy (cf. *Katz* v. *United States* (1967) 389 U.S. 347, 353 [19 L.Ed.2d 576, 583, 88 S.Ct. 507]; *People* v. *Edwards* (1969) 71 Cal.2d 1096, 1104-1105 [80 Cal.Rptr. 633, 458 P.2d 713]) in his use and enjoyment of the premises for the same period.

■    That privacy, of course, is not absolute: the cases also recognize that the tenant is generally deemed to give implied consent to reasonable entries by the owner or his agents, but only for certain narrowly limited

---

[3]Although *Krauss* was overruled in part in *People* v. *Cook* (1978) 22 Cal.3d 67, 99 [148 Cal.Rptr. 605, 583 P.2d 130], the portion of the opinion we rely on herein was not questioned and remains a correct statement of law.

purposes relating to the owner's interest in the property. For example, it is settled that a hotel guest is deemed to impliedly consent to hotel employees' entering his room at reasonable times to perform janitorial, maid, or repair services; but neither the employee nor the owner has implied consent to enter for the purpose of personally searching for contraband, weapons, or evidence of crime—and because he lacks that authority, he has no power to consent to an entry by the police for the same purpose. (See, e.g., *Stoner* v. *California, supra,* 376 U.S. at p. 489 [11 L.Ed.2d at pp. 860-861]; *Krauss* v. *Superior Court, supra,* 5 Cal.3d at p. 422.) Again these rules are generally applicable without regard to the character of the premises, the duration of the tenancy, or the nature of the consideration.

■ It follows that an agricultural employer who provides housing for his farmworkers as part of the compensation for their labor has no right to give the police permission to enter such housing for law enforcement purposes while it is lawfully occupied, whether or not the tenant or his family are present at the time. ■ ■■■ The People failed to show that the arresting officers in the case at bar reasonably believed the contrary.[4]

## II

■ In successfully opposing the motion to suppress, however, the People also urged that the failure of the officers to obtain a warrant was justified by the fact they were in "hot pursuit" of defendant throughout the events in question. The record supports this claim.

■ The cases have recognized that in appropriate circumstances the fresh pursuit of a fleeing felon may constitute a sufficiently grave emergency to justify an exception to the warrant requirement and make it constitutionally reasonable for the police to enter a private dwelling without prior authorization of a magistrate. (See, e.g., *Coolidge* v. *New Hampshire* (1971) 403 U.S. 443, 481 [29 L.Ed.2d 564, 591-592, 91 S.Ct. 2022]; *Warden* v. *Hayden* (1967) 387 U.S. 294, 298-299 [18 L.Ed.2d 782, 787-788, 87 S.Ct. 1642]; *People* v. *Wetzel* (1974) 11 Cal.3d 104, 108 & fn. 4

---

[4]No different result is required by the additional fact that Perham testified he still had some items of personal property stored in the foreman's house on the night in question. Under the foregoing rule an owner who stores goods on demised premises with the knowledge of his tenant may have implied consent to enter at reasonable times for the limited purpose of exercising his dominion over the goods, e.g., by removing some or all of them; but for the reasons stated, this circumstance does not give him *carte blanche* to invite the police in for the purpose of interrogating the tenant or searching the premises.

[113 Cal.Rptr. 32, 520 P.2d 416]; *People* v. *Dumas* (1973) 9 Cal.3d 871, 882 [109 Cal.Rptr. 304, 512 P.2d 1208].) "There is no ready litmus test for determining whether such circumstances exist, and in each case the claim of an extraordinary situation must be measured by the facts known to the officers." (*People* v. *Ramey* (1976) *supra,* 16 Cal.3d 263, 276.) Accordingly, we do not attempt a compendium of all instances in which such a claim may be maintained, but limit our analysis to the facts of the case at bar.

■ The record herein shows without contradiction that Gage surprised defendant in the act of committing a burglary and the chase began immediately, first on foot and then by automobile. Although Gage eventually lost sight of defendant, he promptly gave the police defendant's description and the registration information from the abandoned getaway car. That information in turn produced defendant's address, which was then broadcast over police radio. Officers who were already actively following the leads in the case heard the broadcast and went directly to defendant's residence. Defendant had reached the premises only a short time earlier. The officers entered, observed defendant's distinctive shirt, and after brief questioning placed him under arrest for the burglary. The entire sequence of events took approximately one hour.

On these facts the propriety of the warrantless police entry is established by our decisions in *People* v. *Gilbert* (1965) 63 Cal.2d 690, 705-707 [47 Cal.Rptr. 909, 408 P.2d 365], vacated on other grounds (1967) 388 U.S. 263 [18 L.Ed.2d 1178, 87 S.Ct. 1951], and in *People* v. *Smith* (1966) 63 Cal.2d 779, 795-797 [48 Cal.Rptr. 382, 409 P.2d 222]. In the first of these cases Gilbert and Weaver committed a robbery-murder at 10:30 a.m., and escaped by automobile; following the directions of eyewitnesses, a pursuing police officer apprehended Weaver some blocks away in one of the getaway cars. Weaver had been wounded in the shootout and was taken to a hospital, where he subsequently told an investigating FBI agent the name and address of his accomplice Gilbert. This information was broadcast over police radio, and at 1 p.m. another agent proceeded to Gilbert's address. When additional officers arrived 10 minutes later, they entered the premises, discovered them to be unoccupied, and found damaging evidence. No warrant had been obtained. We unanimously upheld the lawfulness of the police conduct on the ground that a search is constitutionally reasonable "when the officers enter in fresh pursuit of escaping felons to make an arrest." (63 Cal.2d at p. 706.) We concluded that it was not unreasonable for the police to assume that the missing accomplice might be on the premises, and that the agents entered not to make a general exploratory search for evidence of guilt

"but in fresh pursuit to search for a suspect and make an arrest." (*Id.,* at p. 707.)[5]

In *Smith* a similar scenario occurred. There Smith and his accomplice Walker attempted to cash a fictitious check at a Sears, Roebuck store but were detained for investigation; Smith drew a gun and shot his way out of the store, killing two police officers, and escaped in his car. Other police arrived on the scene, arrested Walker, and found her driver's license in her purse; in response to their questions she admitted that Smith also lived at the address shown on the license. Two officers were then dispatched to the address; failing to obtain a key from the landlord, they entered through a window, learned the premises were unoccupied, and found incriminating evidence. Again no warrant had been obtained. We unanimously upheld the entry and search, reasoning that although Smith had escaped from the scene of the crimes "the manhunt began immediately. It was reasonable for the police to believe he might stop at his house before continuing his flight, to obtain clothes, money, or ammunition." (63 Cal.2d at p. 797.) We concluded (*ibid.*) that the case was governed by the rule that "fresh pursuit of a fleeing suspect who has committed a grave offense and remains dangerous to life and limb may constitute 'exceptional circumstances' sufficient to justify a search without a warrant. [Citations.]" (See also *People* v. *Bradford* (1972) 28 Cal.App.3d 695, 700-705 [104 Cal.Rptr. 852].)

■ These decisions demonstrate that although "fresh pursuit" of a fleeing felon must be substantially continuous and afford the law enforcement authorities no reasonable opportunity to obtain a warrant, it is not necessary that the suspect be kept physically in view at all times. ■ ■■■. They also refute defendant's contention that his presence at the ranch negated any inference of flight because if he were truly attempting to escape it is "unlikely" he would have returned to his house after the burglary.[6] Finally, the cases are not distinguishable on the ground, urged by defendant, that the officers herein assertedly had no reason to believe he was armed and dangerous. Throughout the events in question the police were pursuing a man whom they suspected of having

[5]We distinguished *Stoner* v. *California* (1964) *supra,* 376 U.S. 483, in which the hotel clerk let the police into the defendant's room two days after the robbery. We reasoned (p. 707 of 63 Cal.2d) that in *Stoner* "The officers were not in fresh pursuit of escaping robbers, and they therefore had no reason to believe that the accomplice was in defendant's room. Moreover, they had time to obtain a warrant. Accordingly, there were no exigent circumstances such as existed in the present case to justify the search."

[6]Nor is there any relevance to defendant's claim that he was not in possession of "readily disposable evidence, such as narcotics . . . ." The hot pursuit doctrine is

broken into an occupied private home in the middle of the night to commit a burglary; this is a serious crime, with an ever-present potential for exploding into violent confrontation. The need to prevent the imminent escape of such an offender is clearly an exigent circumstance within the doctrine here invoked.[7]

As with all exceptions to the warrant requirement, the courts must ever be on their guard to keep the "hot pursuit" justification within firm and narrow bounds: "the exception must not be permitted to swallow the rule" (*People* v. *Smith* (1972) 7 Cal.3d 282, 286 [101 Cal.Rptr. 893, 496 P.2d 1261]). On the record before us, however, we are persuaded the warrantless arrest of defendant inside his house was fully justified on this ground. It follows that the trial court correctly denied defendant's motion to suppress the evidence seized as an incident thereto.

The judgment is affirmed.

Bird, C. J., Tobriner, J., Clark, J., Richardson, J., Manuel, J., and Newman, J., concurred.

---

designed to prevent the escape of fleeing felons; a consequential seizure of evidence, disposable or otherwise, is merely incidental to that purpose. In any event, the distinctive shirt worn by the burglar herein was not significantly less "disposable" than narcotics or other contraband.

[7]The same authorities refute defendant's final complaint, i.e., that the arresting officers failed to comply with Penal Code section 844 before entering his house. (*Gilbert,* at p. 707 of 63 Cal.2d; *Smith,* at p. 797 of 63 Cal.2d.)