[Crim. No. 9699. Third Dist. May 24, 1979.]

THE PEOPLE, Plaintiff and Appellant, v.
MIGUEL AMAYA, JR., Defendant and Respondent.

**COUNSEL**

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, Joel E. Carey and Arthur G. Scotland, Deputy Attorneys General, John M. Price, District Attorney, and Ronald W. Tochterman, Chief Assistant Deputy District Attorney, for Plaintiff and Appellant.

W. Bradley Holmes for Defendant and Respondent.

## Opinion

**PUGLIA, P. J.**—Defendant was charged in count I of the information with murder (Pen. Code, § 187) and in count II with possession of heroin for sale (Health & Saf. Code, § 11351). A motion to suppress (Pen. Code, § 1538.5) was granted by the trial court, and defendant's motion to dismiss (Pen. Code, § 995) was thereafter granted as to count II.

▉ The People appeal from the judgment of dismissal, contending the trial court erroneously determined that certain evidence was the product of an unlawful search and seizure.[1]

Shortly after midnight July 22, 1977, Deputy Sheriff Long responded to a report of a shooting at apartment 5 of the Villa South apartments. He observed a pool of fresh blood in front of apartment 5 and a trail of blood leading from the apartment to a laundry room around the corner. In the laundry room he found the body of the victim, Robert Gregory Serrato. The victim appeared to have been shot several times. Searching for suspects or other victims, Long entered apartment 5. He found no one within. From the presence of blood on the living room floor and in the bedroom, Long concluded the shooting had occurred in the apartment.

At approximately 12:45 a.m., Detective Carter, a homicide inspector, arrived at the scene. He was briefed by Long and advised that the shooting had occurred in apartment 5. He observed the victim's body where it lay and the blood in the surrounding area outside the apartment. About 10 minutes after Carter arrived, Long took him inside apartment 5. At that point Carter was interested in a view of the crime scene to assist in planning his investigation. He looked in the various rooms of the apartment, observed fresh blood stains on the floor and walls and withdrew after about two minutes. Approximately one hour after his initial entry, Carter and other officers entered for the purpose of locating evidence which might lead to the identity and apprehension of those responsible for Serrato's death.

---

[1]The People's appeal is noticed under subdivisions (a)(1) and (a)(7) of Penal Code section 1238. We treat the appeal as from an order dismissing count II pursuant to Penal Code section 1385. (*People* v. *Minervini* (1971) 20 Cal.App.3d 832, 836 [98 Cal.Rptr. 107].)

The People sought pretrial review in this court of the order granting defendant's motion to suppress (Pen. Code, § 1538.5, subd. (o)). We summarily denied the petition for writ of mandate (3 Civ. 17673). Thereafter the murder charge (count I) was dismissed by the superior court on the People's representation that it would not be brought to trial within 30 days. The People assert the murder charge will be refiled when this appeal is resolved.

Inside the apartment the officers observed a gray jacket lying on the living room couch. Inside a jacket pocket were 2 hypodermic needles, a napkin or towel, and 9 balloons of heroin totaling 21.2 grams. In the bedroom closet, the officers found a holster, a pistol and an ammunition belt containing .38 caliber bullets. From a hall closet the officers took a vehicle registration slip in the name of "M. Amaya, Jr."

The trial court ordered all of the foregoing items suppressed. That order deprived the narcotics possession charge of any evidentiary basis and precipitated the order of dismissal from which the People appeal.

■ The necessity for a warrant authorizing a search of a dwelling is excused in certain emergency circumstances. Thus, officers need not secure a warrant to enter a dwelling in fresh pursuit of a fleeing suspect believed to have committed a grave offense and who therefore may constitute a danger to others. (*People* v. *Gilbert* (1965) 63 Cal.2d 690, 707 [47 Cal.Rptr. 909, 408 P.2d 365], vacated on other grounds in *Gilbert* v. *California* (1967) 388 U.S. 263, 274-275 [18 L.Ed.2d 1178, 1187, 87 S.Ct. 1951]; *People* v. *Smith* (1966) 63 Cal.2d 779, 797 [48 Cal.Rptr. 382, 409 P.2d 222]; *People* v. *Escudero* (1979) 23 Cal.3d 800 [153 Cal.Rptr. 825, 592 P.2d 312].) Nor is a warrant required when, having come upon the scene of a crime, officers reasonably suspect a victim or victims might be inside a dwelling and in need of immediate aid. (*People* v. *Hill* (1974) 12 Cal.3d 731, 754-755 [117 Cal.Rptr. 393, 528 P.2d 1]; *People* v. *Roberts* (1956) 47 Cal.2d 374, 377-378 [303 P.2d 721].)

■ Given the right to enter a building to search for suspects or victims, police may thereafter seize evidence in plain sight during the course of a search suitably circumscribed by the exigencies which justify its initiation. (*People* v. *Hill, supra,* 12 Cal.3d at pp. 755-756; *People* v. *Smith, supra,* 63 Cal.2d at pp. 797-798; *People* v. *Gilbert, supra,* 63 Cal.2d at p. 707; *People* v. *Carter* (1972) 26 Cal.App.3d 862, 872-873 [103 Cal.Rptr. 327].) Matters so subject to seizure include contraband and all other property, tangible or intangible, as to which there is a sufficient nexus with criminal behavior. The controlling test is whether it would be reasonable under the circumstances for the officers " 'to believe that the evidence . . . will aid in a particular apprehension *or* conviction.' (*Warden* v. *Hayden, supra,* 387 U.S. 294, 307 [18 L.Ed.2d 782, 792]; *Guidi* v. *Superior Court, supra,* 10 Cal.3d 1, 11-14 [109 Cal.Rptr. 684, 513 P.2d 908].)" (*People* v. *Hill, supra,* 12 Cal.3d at pp. 755-756; italics added.)

Two cases illustrate the permissible scope of search under the emergency circumstances doctrine. In *People* v. *Gilbert, supra,* 63 Cal.2d 690, officers had properly entered an apartment in search of fleeing criminals. They found the apartment unoccupied but seized certain items of evidence. The court stated: "While the officers were looking through the apartment for their suspect they could properly examine suspicious objects in plain sight. [Citation.] Moreover, they could properly look through the apartment for anything that could be used to identify the suspects or to expedite the pursuit." (*People* v. *Gilbert, supra,* 63 Cal.2d at p. 707.) The court approved the seizure of latent fingerprints lifted from the apartment as well as the following items of evidence: "On the coffee table . . . a notebook with a drawing of the area of the . . . [crime scene]. *Inside* an Alpha Beta shopping bag . . . some rolls of coins bearing the name of the [bank which had been robbed] . . . [A]n ammunition clip from a .45 caliber automatic pistol, and . . . on top of a bedroom dresser an envelope from a photography studio with a photograph of [the defendant] *inside.*" (Italics added; *id.,* at p. 706.)

Similarly, in *People* v. *Hill, supra,* 12 Cal.3d 731, entry was made pursuant to emergency circumstances prompted by the motive of saving life. Again police found no one in the house but certain items of evidence were seized. The Supreme Court approved the seizure of a black purse and its contents which were spilled on the living room floor and a notebook and address book found in the room where the murder occurred which, the court noted, might reasonably contain names, addresses and other information providing a clue to the identity of the murderers. (*People* v. *Hill, supra,* 12 Cal.3d at p. 756.)

In both *Gilbert* and *Hill* the court allowed the police, as an adjunct to their warrantless entries to search for suspects or victims, to inspect and seize objects in plain sight which might reasonably lead to the identification and apprehension of criminals still at large. Of particular importance here, the court allowed the officers to look *inside* bags, notebooks, envelopes and purses in pursuit of this goal.

 In the instant case, the items suppressed were in plain sight within the meaning of the *Hill* and *Gilbert* decisions. Moreover, as to each item, the police reasonably could have believed its seizure could aid in the apprehension or conviction of the individual or individuals responsible for the murder under investigation. (*People* v. *Hill, supra,* 12 Cal.3d at pp. 755-756; *People* v. *Gilbert, supra,* 63 Cal.2d at p. 707.) Thus the jacket lying on the couch in the living room of the apartment where

the murder occurred was obviously a potential repository of information concerning the suspects. When the officers found heroin and narcotics paraphernalia in the pocket, they were not required to ignore it merely because it was not unambiguously probative of the murderer's identity. The gun, ammunition, and holster were found on a shelf in the closet in the bedroom in which there were blood spots; it was reasonable to believe that these items were connected with the shooting. The vehicle registration slip provided a possible clue to the identity of the killer and the vehicle in which he might be found. Unquestionably, had the suppressed items been taken by Officer Long during his first entry into the apartment, their seizure would have been permissible as items encountered in the course of a reasonable search for suspects or victims.

However, the suppressed items were seized not by Officer Long, but following an entry into the apartment approximately two hours after Long's initial entry at a time when the exigent circumstances which justified Long's entry, namely the possible presence of suspects or victims in the apartment, had been resolved. Nonetheless as we shall explain, these facts do not constitute the search in question illegal.

■ The constitutionality of a particular search is always a question of reasonableness and depends on a balance between the public interest in the arrest and apprehension of criminals and the individual's right to personal security free from arbitrary interference by law officers. (*United States* v. *Brignoni-Ponce* (1975) 422 U.S. 873, 878 [45 L.Ed.2d 607, 615, 95 S.Ct. 2574]; *Terry* v. *Ohio* (1968) 392 U.S. 1, 19 [20 L.Ed.2d 889, 904, 88 S.Ct. 1868].) ■ Under the circumstances presented here, the entry and search by Detective Carter falls within the scope of reasonable police activity.

Officer Long arrived at the scene to discover an obvious murder apparently just committed. A most cursory investigation established that the murder had been committed in apartment 5 and that the killer or killers had fled. Officer Long immediately sealed off the crime scene, including apartment 5, awaiting the arrival of detectives to commence the investigation. Carter, the first detective to arrive, entered apartment 5 only briefly and then withdrew until other detectives came to assist him. When he made his second entry, he was still unaware of the identity of either the victim or the perpetrator or perpetrators of the crime, although he was then aware the apartment had been rented to a Miguel Amaya, and he suspected the occupant or occupants of apartment 5 "had a part" in the offense.

Only a short time before Carter's second entry into apartment 5 in the company of other detectives, Officer Long had been inside the apartment where he could "properly look through the apartment for anything that could be used to identify the suspects or to expedite the pursuit." (*People v. Gilbert, supra,* 63 Cal.2d at p. 707.) Although Long physically departed the apartment without seizing any evidence after little more than a minute inside, he immediately asserted exclusive police control over the premises by sealing them off. Thus his physical withdrawal from the apartment did not terminate what was in legal effect an uninterrupted police presence in apartment 5, extending from Long's initial entry through Carter's second entry in the company of other detectives.

We do not believe that Officer Long, by departing apartment 5 and deferring to the detectives the active investigation of the crime irretrievably relinquished all opportunity for law enforcement to make a suitably circumscribed search of the premises to aid in identifying and apprehending the culprits. Our highest court, reviewing closely analogous circumstances, has stated in words peculiarly applicable to the instant facts, "Little purpose would have been served by [his] remaining in the building, except to remove any doubt about the legality of the warrantless search and seizure later that same morning. Under these circumstances, we find that the morning [entry was] no more than an actual continuation of the first [entry], and the lack of a warrant thus did not invalidate the resulting seizure of evidence." (*Michigan v. Tyler* (1978) 436 U.S. 499, 511 [56 L.Ed.2d 486, 499, 98 S.Ct. 1942].)

Taking all the foregoing factors into consideration, and balancing the need of the state for effective law enforcement against the rights of the individual (*United States v. Brignoni-Ponce, supra,* 422 U.S. at p. 878 [45 L.Ed.2d at p. 615]), we find the reentry and limited search by Detective Carter under these circumstances to have been reasonable.

The recent decision of *Mincey v. Arizona* (1978) 437 U.S. 385 [57 L.Ed.2d 290, 98 S.Ct. 2408], does not compel a different result. In *Mincey,* the Supreme Court invalidated an exhaustive exploratory search of a residence which lasted four days and for which the sole justification advanced for lack of a warrant was the fact that the residence was the scene of a recent homicide. Moreover, before the search commenced, the suspect had been arrested and no additional victims were suspected.

The situation in *Mincey* is to be distinguished from that presented by the record before us where the officers' conduct went no further than the

seizure of items which could reasonably result in the identification, apprehension or conviction of the perpetrators and which could have been lawfully seized during the original entry by Officer Long. Our conclusion herein goes no further than to find no unreasonable conduct when police wait a reasonable time for trained personnel before disturbing lawfully seizable evidence at the location of a recent homicide.

The judgment of dismissal as to count II of the information is reversed and the matter remanded with directions to vacate the order suppressing evidence and to proceed with the prosecution according to law.

Paras, J., concurred.

**REYNOSO, J.,** Dissenting.—The majority impermissibly carves out yet another exception to the cardinal constitutional rule that warrantless searches are per se a violation of the Fourth Amendment. The police, say the majority, may search a residence without a warrant so long as the premises have been previously secured. Since that is not and has never been the law, I dissent.

I respectfully suggest that the majority proceed on a fatally defective view of the constitutional protection against unreasonable searches. We should start with the beginning—the Fourth Amendment. It reads: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." The United States Supreme Court has recently had occasion in *Mincey* v. *Arizona* (1978) 437 U.S. 385, 390 [57 L.Ed.2d 290, 298, 98 S.Ct. 2408] to remind us that "The Fourth Amendment proscribes all unreasonable searches and seizures, and it is a cardinal principle that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable. . . .'" Only a few "specifically established and well-delineated exceptions" (*Katz* v. *United States* (1967) 389 U.S. 347, 357 [19 L.Ed.2d 576, 585, 88 S.Ct. 507] have been judicially engrafted upon the Fourth Amendment.

The basis for the majority holding that the search was proper easily slips from "exigent circumstance" to "reasonableness." And, in the final analysis, the majority maintain that the search was not constitutionally

defective because it was reasonable (and not because the circumstances were exigent).[1] The search in question, the majority convincingly argue, was reasonable. It is reasonable for the police to painstakingly search the scene of a serious crime even two hours after the original entry. Who can disagree? Not I. I agree there was probable cause to search.

But the reasonableness of the search, as the majority or I would view it, is beside the point. The Constitution proceeds on a suspicion that those in authority will abuse that authority if they face no proper restraints. The restraint which has been placed on the police (and all other officials) by the Constitution is that the reasonableness will be tested on the basis of a warrant and that the warrant will be presented to a magistrate who can rule upon it based on all of the particulars included in that warrant. That is the Constitution. No warrant was here presented. Therefore, the issue before us is not merely whether the search was reasonable but whether such circumstances existed as would come within those very strict limitations when a search can be conducted without a warrant.

I turn, therefore, to the exception which, according to the majority, controls—exigent circumstances. I find no exigency for a search which took place several hours after the crime and after the premises had been secured. It appears to me that even the majority suggest no exigency. Rather, it suggests only a strained extension of a true exigency to now cover a nonexigency. What was to prevent the police from obtaining a search warrant after the premises were secured? Apparently, nothing more than police inconvenience. Inconvenience, in my view, cannot be a reason for failing to follow the clear mandate of the Constitution.

The trial court correctly observed that at the time of the search, which it held to be unlawful, there was no victim and no suspect in the apartment, the site had been secured, and the police had had an opportunity to obtain a search warrant. The trial court properly applied the law and was properly mindful of the protection which the Constitution affords. By today's ruling, the majority weakened the Constitution and articulate a new rule of law.

A petition for a rehearing was denied June 19, 1979. Reynoso, J., was of the opinion that the petition should be granted. Respondent's petition for a rehearing by the Supreme Court was denied July 19, 1979.

---

[1]The key phrase by the majority opinion is this: "The constitutionality of a particular search is always a question of reasonableness." (Maj. opn., *ante*, p. 430.)