[No. AO19979. First Dist., Div. Two. Apr. 24, 1984.]

THE PEOPLE, Plaintiff and Respondent, v.
LARRY A., a Minor, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

\*At the direction of the court, and pursuant to California Rules of Court, rules 976 and 976.1, the portion of the opinion certified for publication follows.

COUNSEL

Nancy L. Siegel, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Kristofer Jorstad and Mary A. Roth, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

KLINE, P. J.—By a petition filed on August 4, 1982, Larry A., the minor appellant herein, was charged with burglary, petty theft and misdemeanor possession of marijuana. (Pen. Code, §§ 459, 484; Health & Saf. Code, § 11357, subd. (b).) On August 26, the petition was sustained with respect to the counts charging petty theft and possession of marijuana. The burglary count and a motion to suppress under Welfare and Institutions Code section 700.1 related to that count were dismissed without prejudice.

On August 27, a supplemental petition was filed recharging appellant with burglary, receipt of stolen property, and with being an accessory to a felony. (Pen. Code, §§ 459, 496, 32.) On September 21, after denying appellant's motion to suppress evidence, the court found the burglary charge to be true and made no findings with respect to the remaining two charges. Appellant was continued a ward of the court and committed to the Youth Authority for a maximum period of 38 months with appropriate predisposition credits. Notice of appeal was timely filed on October 22, 1982.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .*

*Facts.*

Ruben Vargas testified that at 8 a.m. on August 2, 1982, he locked and left his home at 1522 Munson Way in Oakland. When he returned at 6 p.m., he found his stereo, two speakers and two television sets missing. Entrance to the house had obviously been obtained through a rear window, which had been removed.

At about 3 p.m. that day Alfredo Becerra saw a person dressed in red, whom he later identified as appellant, come out of a residence at 1522 Munson Way carrying two television sets. He then saw appellant hand the larger of the two television sets to a man in a blue El Dorado, who gave him "something" in return and put the set in the trunk of the car. Appellant took the other set to a nearby apartment house, from which he soon emerged without the set but with another person. The two then went back into 1522 Munson Way through the front door. Shortly appellant came out of the house carrying two speakers; his companion was carrying a stereo receiver. Becerra testified that at that point Bernado Delgado and some companions who were walking down Munson saw the two and yelled at them. Appellant dropped the speakers and fled. Becerra, who followed on his bike, watched appellant reenter the apartment house and reemerge with the small television set he earlier brought in and walk up 15th Street. When Becerra later saw appellant he had changed his clothes and did not have the television set. Delgado told Becerra to call the police, who arrived in about five or ten minutes.

At the time of the foregoing events Rafael Alvarez was at 15th and Munson trying to start his motorcycle. He testified that he also saw a "dude" dressed in an all-burgundy outfit walking down Munson with two television sets. He saw this person give the larger of the two sets to a man in an El Dorado and then put the smaller set by an apartment house. Alvarez then went into the house from which he believed the sets had originally been taken and yelled "anybody home?" No one responded. When he went back onto the street he and his friends, one of whom had written down the license number of the El Dorado, saw the person in the burgundy outfit and another person come out from the apartments. The two, who were then empty handed, entered an alley adjacent to the house on Munson from which the television sets had been taken and soon re-appeared carrying a stereo and speakers. When Alvarez' companion, Benny, yelled at them, they dropped the goods and started to run. Alvarez and Benny grabbed one and held him for

*See footnote, *ante,* page 929.

the police. The other, who was wearing the burgundy outfit and who Alvarez later identified in court as appellant, escaped. However, later that day Alvarez and Benny saw him again a few blocks away wearing different clothing. With the help of others, they restrained him until the police arrived. When the police came to the scene Alvarez heard Benny tell them that appellant was one of those who had taken the television sets, that he had changed his clothes, that he lived in a specified house (later identified as 1529-24th Street) and that the clothes he was originally wearing and a television set would probably be there.

The testimony of Becerra and Alvarez was corroborated in numerous particulars by other witnesses.

Oakland Police Officer James Mari arrested appellant, who was being restrained by three or four juveniles, and then proceeded to appellant's house at 1529-24th Street, to which he had been directed by one of the juveniles. Before Officer Mari went to appellant's house, which was close to the house on Munson that had been burglarized, he handcuffed appellant and put him in his police car. Officer Mari testified that he went to appellant's house to recover evidence, i.e., the television set and the distinctive burgundy clothing appellant was wearing at the time of the crime, which the juveniles in the street told him were probably there. When he knocked on the door a boy appeared who told him that his mother was not home. Although the officer had his foot in the door, the boy resisted his entry. A young woman then came to the door, but she also would not permit the officer to enter. At some point a large man came from within the house and argued with the officer and told him "you're not coming in the house." Then another woman who lived at the house came to the door and also refused to let the officer enter. Officer Mari testified that ". . . I told her that I got this guy [i.e., appellant] and I know there's evidence. I have reason to believe there's evidence in that house and that I was in fresh pursuit of the suspect, I caught him, and I don't know where else the evidence could be. . . . I have information that [the suspect] went in there so I am holding my ground. [¶] And I told her I wasn't going to give up that door and that was it. And I called for cover units. And I called for my sergeant, also." When Sergeant Clark arrived and was briefed on the situation by Officer Mari, the sergeant agreed that the officers should enter and they did so despite the protestations of the inhabitants of the house, and despite the fact that no search warrant had been obtained.

When asked why he did not obtain a warrant, Officer Mari responded, in effect, that to do so would in his opinion have been logistically infeasible.[1]

---

[1]The officer's explanation was as follows: "If I was to stop and to get a search warrant and say, okay, fine, we're going to get a search warrant, which I did mention, I mentioned

In the process of entering the house the police arrested the young woman and the large man for interfering with the investigation. During their search of the premises the police located the television set and burgundy clothes appellant was earlier wearing, which were in plain view within an interior room not visible from the front door.

Appellant's trial counsel objected to the receipt in evidence of the television set and clothing on the ground that it was the product of an illegal search and seizure. Counsel specifically contended that there was an insufficient showing of exigent circumstances to permit a warrantless search.

The trial court disagreed, and the television set and clothing was admitted into evidence.[2]

*Discussion.*

■ "The Fourth Amendment proscribes all unreasonable searches and seizures, and it is a cardinal principle that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable . . . .'" (*Mincey* v. *Arizona* (1978) 437 U.S. 385, 390 [57 L.Ed.2d 290, 298, 98 S.Ct. 2408].) Only a few "specifically established and well-delineated exceptions" (*Katz* v. *United States* (1967) 389 U.S. 347, 357 [19 L.Ed.2d 576, 585, 88 S.Ct. 507]) have been judicially engrafted upon this general proscription and the counterpart set forth in article

---

that if I had to I would get a search warrant, just telling them that, not in my own mind really thinking that I would actually need one, that means I would have had—I could have secured the scene but how would I secure the scene? That means I would have gone into the house anyway and physically removed all the people who were not very polite to me at the time. In fact, they were to the point where like if you come in we're going to do something to you. And they didn't say that. They just indicated that by their physical presence. And there was a lot of yelling and screaming going around. [¶] I don't believe that I could have left—I don't believe that I could have not gone in and removed all the people out of there without having to arrest them for 148, interfering with our investigation. [¶] I would have gotten myself to point A, which is the living room, and another room, but to do that I don't know where they would have gone. I don't know if they had any weapons in there or not. I had never been to this house before in my life, me personally, that I know of in the last eleven years. I didn't know the family or anything like that."

[2]The trial judge reasoned as follows: "It would have appeared unreasonable to this Court for the officers under this circumstance where someone is pointing out a house and saying, this is the house into which this person went within a matter of minutes ago, less than a half hour ago, at which time he had certain stolen goods and he was wearing certain descriptive clothing. I think it would have been unreasonable to have expected the officer then to say, well, okay. What we will do is go down and find some Judge. And first we will write out an affidavit and then we will get us a search warrant. And in the meantime we will put six men in the house to make sure that certain non-cooperative, belligerent people stay put until we get back with it. [¶] I think we have to view this business in the light of some common sense and what's in the best interests of everybody. [¶] I find that there were exigent circumstances which would justify the search without a search warrant. So the 700.1 motion is denied."

I, section 13, of the California Constitution. (*People* v. *Cook* (1978) 22 Cal.3d 67, 97 [148 Cal.Rptr. 605, 583 P.2d 130].)

■ The question whether the search in question was reasonable within the meaning of the Constitution presents a question of law. For this reason we are not bound by the substantial evidence standard in reviewing the trial court's decision; it is rather our responsibility to measure the facts found by the trier against the constitutional standard of reasonableness. (*People* v. *Lawler* (1973) 9 Cal.3d 156, 160 [107 Cal.Rptr. 13, 507 P.2d 621].) In this endeavor we are to exercise an independent judgment. (*People* v. *Leyba* (1981) 29 Cal.3d 591, 596-597 [174 Cal.Rptr. 867, 629 P.2d 961].)

■ We turn first to the relatively simple question whether at the time of the search Officer Mari was in hot pursuit of a suspect and that the police entry was justified by this exigency. The police certainly were not then in pursuit of appellant, who was handcuffed in Officer Mari's patrol car. The Attorney General states that instead the officers were pursuing appellant's accomplice "who was then nowhere to be seen." However, the testimony of Officer Mari reveals that the reason the accomplice was then nowhere to be seen is that he had been restrained at the scene by various witnesses to the crime and immediately taken into custody by Officer Dawes, who arrived before Officer Mari. In short, the record makes it clear that at the time of the entry both suspects were already in custody. The hot pursuit of suspects therefore cannot provide the exigent circumstances needed to justify the warrantless search.

The alternative exigency relied upon by respondent, and apparently as well by the trial court, was the officers' need to immediately seize the evidence they were told was in the house, i.e., the burgundy clothing and the stolen television set. As stated by the Attorney General, "Obviously, an effective 'securing' to prevent destruction of evidence requires entry." This conclusion is not so "obvious." As appellant points out, a television set and clothing, unlike drugs, cannot be flushed down a toilet or otherwise easily destroyed within a house; so that the police could have prevented destruction of the evidence simply by having several officers maintain the house and its occupants under surveillance while another obtained a search warrant. The Attorney General's response to this observation is that "Securing a house is, legally, a seizure of the entire premises, and is subject to Fourth Amendment restrictions." The Attorney General maintains, in other words, that the warrantless securing of premises without entry is as much a violation of the Fourth Amendment as a warrantless entry. This claim is unsupported

by the sole case relied upon (*People* v. *Superior Court (Reilly)* (1975) 53 Cal.App.3d 40 [125 Cal.Rptr. 504])[3] and wholly untenable.

The securing of premises while a warrant is obtained is a salutary and common police practice that has been voluntarily undertaken or required by the courts in far more strained circumstances than those here presented. (See, e.g., *People* v. *Bradley* (1982) 132 Cal.App.3d 737 [183 Cal.Rptr. 434]; *People* v. *Frazier* (1977) 71 Cal.App.3d 690 [139 Cal.Rptr. 573]; *People* v. *Freeny* (1974) 37 Cal.App.3d 20 [112 Cal.Rptr. 33]; *Ferdin* v. *Superior Court* (1974) 36 Cal.App.3d 774 [112 Cal.Rptr. 66]; and *United States* v. *Grummel* (9th Cir. 1976) 542 F.2d 789.) In the present circumstances, where all four occupants of the premises strongly resisted entry, where there is no reason to suspect weapons or danger to law enforcement officers, where the suspects were already in custody, where numerous officers were on the scene and could easily have observed and prevented efforts to take evidence out of the house, where there is no showing of the amount of time that would be required to secure a warrant (by phone or otherwise), where the evidence could not have been physically disposed of within the house without notice and trace, and where, in any event, there is no indication that the persons in the house were characteristically disposed to destroy the evidence sought, the duty to obtain a warrant can be enforced without impairing effective police enforcement of the law. (See *United States* v. *Rubin* (3d Cir. 1973) 474 F.2d 262, 268-269.)[4] ■ As pointed out by the United States Supreme Court, an arrest on the street does not provide its own exigent circumstances so as to justify a warrantless search of the arrestee's house (*Vale* v. *Louisiana* (1970) 399 U.S. 30, 35 [26 L.Ed.2d 409, 414, 90 S.Ct. 1969][5]); nor may such a search be justified merely by the belief, however well founded, that the evidence sought is concealed in the premises in question. (*Agnello* v. *United States* (1925) 269

---

[3]*Reilly* involved the seizure of evidence from a motel room incident to an arrest which was made after officers, who were on public property where they had a right to be, observed incriminating evidence in plain view, which evidence was all that was seized. In those circumstances, as the court noted, "no search was necessary." (*Id.,* at p. 52.)

[4]In *Rubin* the court stated that the relevant circumstances "include (1) the degree of urgency involved and the amount of time necessary to obtain a warrant . . .; (2) reasonable belief that the contraband is about to be removed . . .; (3) the possibility of danger to police officers guarding the site of the contraband while a search warrant is sought . . .; (4) information indicating the possessors of the contraband are aware that the police are on their trail . . .; and (5) the ready destructability of the contraband and the knowledge 'that efforts to dispose of narcotics and to escape are characteristic behavior of persons engaged in the narcotics traffic.' " (*Id.,* at p. 268.)

[5]In *Vale,* as here, "The officers were not responding to an emergency . . . . They were not in hot pursuit of a fleeing felon . . . . The goods ultimately seized were not in the process of destruction . . . . Nor were they about to be removed from the jurisdiction." (*Id.,* at p. 35 [26 L.Ed.2d at p. 414].) Accordingly, the court held that the government had failed to sustain its burden of showing that an "exceptional situation" justified dispensing with the warrant requirement.

U.S. 20, 33 [70 L.Ed. 145, 149, 46 S.Ct. 4, 51 A.L.R. 409]; see also *Stoner* v. *California* (1964) 376 U.S. 483, 487, fn. 5 [11 L.Ed.2d 856, 859, 845 S.Ct. 889], and *Vale* v. *Louisiana, supra,* at p. 34 [26 L.Ed.2d at p. 413].)

■ There is yet an additional reason for the invalidity of the instant search and seizure. Even if it be assumed, solely for the sake of argument, that there was a danger the inhabitants of appellant's house might seek to destroy the evidence, and even indulging the dubious further assumption that the television set and clothing could physically be destroyed, the fact remains that any danger of the destruction of evidence *was created by the police.* If the police had not prematurely attempted to enter the house, and thereby alerted the inhabitants to the presence there of incriminating evidence, they would have had more than enough time to obtain a warrant and conduct a valid search without the threat the police now rely upon to justify their illegal entry. (See *Shuey* v. *Superior Court* (1973) 30 Cal.App.3d 535, 540-541 [106 Cal.Rptr. 452] (Kaus, J.).) " 'Failing to obtain a warrant when time permits, then seeking consent to search, and ultimately maintaining that an emergency arises when consent is refused, has been referred to as a "do-it-yourself" emergency and has been thoroughly criticized.' " (Comment, *Warrantless Residential Searches to Prevent the Destruction of Evidence: A Need for Strict Standards* (1979) 70 J. Crim. L. & C. 255, 267, quoting the Project on Law Enforcement Policy and Rulemaking, Model Rules for Law Enforcement—Warrantless Searches of Persons and Places (Approved Draft 1974); see also *Shuey* v. *Superior Court, supra.*)

For the foregoing reasons, we find that the challenged search was unreasonable within the meaning of the Fourth Amendment and that denial of the motion to suppress was error.

Accordingly, the jurisdictional finding of burglary is set aside and the matter remanded to the juvenile court for new proceedings.

. . . . . . . . . . . . . . . . . . . . . . . .*

Rouse, J., and Smith, J., concurred.

---

*See footnote, *ante,* page 929.