[No. B013365. Second Dist., Div. Seven. July 30, 1986.]

THE PEOPLE, Plaintiff and Respondent, v.
TEDDY LEE WHITE, Defendant and Appellant.

[No. B018530. Second Dist., Div. Seven. July 30, 1986.]

In re TEDDY LEE WHITE on Habeas Corpus.

## COUNSEL

Corrine S. Shulman, under appointment by the Court of Appeal, Arredondo & Mendoza and David Arredondo for Defendant and Appellant and Petitioner.

John K. Van de Kamp, Attorney General, Norman H. Sokolow and Mark Alan Hart, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**JOHNSON, J.**—Appellant was convicted of rape. The primary issue on appeal relates to the admissibility of evidence obtained during a warrantless entry of appellant's home. We hold the entry was not justified under the "hot pursuit" doctrine and consequently reverse.

### STATEMENT OF FACTS AND PROCEEDINGS BELOW

The prosecution's evidence established the following facts. Shortly after midnight on July 2, 1984, the eventual victim, Ms. C., and a girlfriend were driving back from a party in a borrowed Cadillac. The car broke down. The girlfriend decided to return to the party. Ms. C. elected to continue on home. She called her mother from a phone booth. She then walked to a bus stop to wait for her mother.

A few minutes later appellant Teddy Lee White drove up and asked Ms. C if she wanted a ride home. She declined and said her mother was picking her up. White left but then returned to a gas station at the same intersection. He walked over to Ms. C., grabbed her by the arm and threatened to kill her if she didn't enter his car. Ms. C. feared he had a gun, although she never saw one.

White drove Ms. C. to his home. He forced her out of the car and into the house. As they walked through the living room she saw two people

asleep on couches. White and Ms. C. went to his bedroom at the rear of the house. He told her to take off her shoes and get comfortable. He would drop her off at her home in the morning. He then told her to join him in bed. She refused. This angered appellant. "Don't no woman get into my bedroom without getting into the bed with me." He pushed her onto the bed and began stripping her clothes off. He beat her, tried to smother her with a pillow, and threatened to kill her if she continued screaming. Eventually he succeeded in penetrating her.

After the sex act, appellant left the bed and started dressing. He instructed Ms. C. to remain in bed until he said she could get out. But she ignored him and put on her pants anyway. White unlocked a side door and told her to leave. Ms. C. grabbed her purse and jacket and took his invitation. She ran to appellant's car to obtain his license number. Before she could, however, appellant ran out. He chased her around some cars parked on the street. She started screaming. White told her to quiet down because of his neighbors. But she continued screaming. White gave up the chase, jumped in his car and drove away.

It was now between 5 and 6 in the morning. Ms. C. walked to the nearest telephone booth and called the police. Officer Gray arrived at the phone booth at 6:45 a.m. Ms. C. was in bad shape. Her clothes were disheveled. Her face, mouth and jaw were swollen and dried blood covered a cut on her mouth. She told the officer she had been raped. She also gave him the address where the rape had taken place, described her assailant, and said the rapist had driven away in his car.

Officer Gray drove to appellant's residence. He did not see appellant's automobile there. The officer immediately walked to the front entrance of the house. Two young men came to the door and told him appellant had left. Nonetheless, Officer Gray ordered the young men out of the house and entered. He walked directly to the bedroom. He did not find the defendant there. But he did find bloodstained sheets matching the description Ms. C. had given. He also noted the room did not smell of PCP.

On August 6, 1984, the People filed an information charging appellant with forcible rape and kidnapping. White moved to suppress the sheets and Officer Gray's observations obtained during the warrantless entry of his home and bedroom. This motion was denied.

The case proceeded to jury trial on February 14, 1985. White testified in his own defense.[1] He claimed Ms. C. was already battered and disheveled

---

[1] White also introduced testimony from a former wife and from a current girlfriend. Both testified to appellant's honesty and to his nonviolent nature. The girlfriend also testified appellant had taken her and her children to a drive-in movie the night of the alleged assault and had not left her home until 4 a.m.

when he picked her up at the bus stop. She said she had been in a fight with her boyfriend. She voluntarily went to appellant's house and consented to have sex with him. After sex, Ms. C. lit up a PCP cigarette. He volunteered to take her home, but she wanted to stay in his house until he returned from work that evening. He didn't want her to remain in his house the rest of the day. He had to pull her from the house. This upset her. He gave up trying to persuade her to enter his car and drove away.

After the defense rested and while oral argument was underway White's lawyer finally located appellant's nephew. He was one of the two young men sleeping in the living room. He would have testified he heard no screaming from his uncle's bedroom indeed that he slept through whatever was happening in that room. White's trial counsel tried to obtain a stipulation from the prosecutor allowing him to put on this additional evidence. The People refused, however, and counsel failed to move to reopen.

The jury returned its verdict on February 26—not guilty of kidnapping but guilty of forcible rape. White moved for new trial on the basis of newly discovered evidence—the nephew. This motion was denied and sentence imposed on March 26, 1985. The trial court imposed the low term of three years. Appellant appealed on grounds his motion to suppress and his motion for new trial should have been granted. He also filed a habeas corpus alleging ineffective assistance of counsel.

## DISCUSSION

I. The "Hot Pursuit" Doctrine Does Not Require That the Pursuing Officers Personally Follow the Fleeing Suspect From the Scene of the Crime to the Building They Enter Without a Warrant

█ The Fourth Amendment requires law enforcement officers to obtain a warrant before entering a citizen's home. (See, e.g., *Payton* v. *New York* (1980) 445 U.S. 573 [63 L.Ed.2d 639, 100 S.Ct. 1371]; *People* v. *Ramey* (1976) 16 Cal.3d 263 [127 Cal.Rptr. 629, 545 P.2d 1333].) One of the few exceptions to this rule—and the one the trial court invoked in this case—is the so-called "hot pursuit" doctrine. █ As the term suggests, this exception dispenses with the warrant requirement when officers are chasing a suspect who is in active flight. The justification is that otherwise he might escape again while the police sit around waiting for the warrant to be issued.

In the archetypical situation the officers arrive at the scene of the crime as the suspect jumps in his car and speeds away. The officers pursue him

in their own vehicle for several miles without losing track of him. The suspect finally pulls into a driveway and flees into a house. The officers pull in right behind him and chase after him into the house. They find him hiding in one of the rooms, place him under arrest, search him and find the stolen jewels. The jewels are admissible even though the officers entered the house without a warrant because they were in "hot pursuit" of a fleeing felon.

■ Entries of dwellings have been found to be in "hot pursuit" in California without fitting this archetype, however. Indeed we do not question the officers were in "hot pursuit" of White, as "hot pursuit" has been defined in the cases. In *People* v. *Escudero* (1979) 23 Cal.3d 800 [153 Cal.Rptr. 825, 592 P.2d 312]; *People* v. *Smith* (1966) 63 Cal.2d 779 [48 Cal.Rptr. 382, 409 P.2d 222]; and *People* v. *Gilbert* (1965) 63 Cal.2d 690 [47 Cal.Rptr. 909, 408 P.2d 365], reversed on other grounds (1967) 388 U.S. 263 [18 L.Ed.2d 1178, 87 S.Ct. 1951], the police learned of the suspect's probable route of flight from third party witnesses rather than by personally pursuing him from the scene of the crime. Here the victim was only a half-block away from the crime scene. Moreover, it was a half-hour to an hour after the crime's commission when she described the defendant and the officers took off after him. Only minutes later the officers arrived at and entered White's house. This is well within the life span of a "hot pursuit" as established by the California Supreme Court. For instance, in *People* v. *Gilbert, supra,* 63 Cal.2d 690, about two and one-half hours elapsed between the crime and the entry. Still the Supreme Court upheld the entry as falling under the "hot pursuit" exception to the warrant requirement.

II. The "Hot Pursuit" Doctrine Requires at Least a "Reasonable Belief or "Strong Reason to Believe" the Fleeing Suspect Is in His Home Before Entering That Home Without a Warrant

■ The issue here is not whether the officers were in hot pursuit of a criminal suspect but whether they could reasonably have pursued him where they did. Here the same person who told the officers of the crime and described the suspect also told them he had driven away from his house. When they arrived his car had not returned. Moreover, when they knocked on the door, the officers were again told he had left and was not there. Still they persisted in ordering the occupants from the house and forcing their way in. To state the issue raised by these facts bluntly, are officers in hot pursuit of a fleeing felon entitled to enter the suspect's house without a warrant even though they have every reason to believe he is not at home?

Appellant White argues officers must have a full measure of "probable cause" to believe a fleeing felon is actually in his house before they may

enter in the same sense they must have probable cause to believe certain designated property is present before they may enter to search for evidence. We have found no support for this proposition in the case appellant cites, *People* v. *Larry A.* (1984) 154 Cal.App.3d 929 [201 Cal.Rptr. 696], nor in any other California opinion we have been able to locate. Nor, it should be added, have we found cases expressly holding officers can pursue a suspect into his home where they *lack* probable cause to believe he has fled.

Whether pursuing officers must have "probable cause" to believe a suspect is present before entering his own home remains an unresolved question at the federal level as well. ■ Of course, they must have probable cause to believe the person to be arrested has committed a crime. (See, e.g., *Beck* v. *Ohio* (1964) 379 U.S. 89 [13 L.Ed.2d 142, 85 S.Ct. 223]; Comment, 28 U.Chi.L.Rev. 664 (1961).) ■ Furthermore, it is well settled officers cannot enter a *third person's* home to arrest the suspect unless they have "probable cause" to believe he is there. (*Llaguno* v. *Mingey* (7th Cir. 1984) 739 F.2d 1186, on rehg. 763 F.2d 1560); *Fisher* v. *Volz* (3d Cir. 1974) 496 F.2d 333; cf. *Steagald* v. *United States* (1981) 451 U.S. 204 [68 L.Ed.2d 38, 101 S.Ct. 1642] [arrest warrant and officer's reasonable belief arrestee present insufficient to authorize entry of third person's home to search for arrestee in absence of exigent circumstances or detached scrutiny of judicial officer as to probable cause to believe arrestee present]; see also La Fave, Search and Seizure (1978) § 6.1, p. 374, and cases cited therein.) ■ But the United States Supreme Court has reserved the question whether officers must have a full measure of probable cause to believe the suspect is in his own home before entering that dwelling. In *Payton* v. *New York*, *supra*, 445 U.S. 573, the high court considered and rejected the notion a police officer could enter a suspect's home to arrest him without a warrant and without exigent circumstances. Along the way the court observed: "Before addressing the narrow question presented by these appeals, we put to one side other related problems that are *not* presented today. . . ." (445 U.S. at pp. 582-583 [63 L.Ed.2d at p. 648], italics in original.) "We . . . note that *in neither case is it argued that the police lacked probable cause to believe that the suspect was at home when they entered.*" (445 U.S. at p. 583 [63 L.Ed.2d at p. 649], italics added.)

There is some authority in lower federal courts and other states suggesting a full measure of probable cause about the suspect's location is required before entering his premises. In *United States* v. *Phillips* (9th Cir. 1974) 497 F.2d 1131, agents broke into the suspect's place of business at midnight for the purpose of arresting him. The Ninth Circuit ruled this an unlawful entry and suppressed evidence agents found in the office specifically because "the agents did not have *probable cause* to believe that Phillips was in the

office building at the time of the raid." (497 F.2d at p. 1136, italics added.) (See also *United States* v. *Shye* (6th Cir. 1974) 492 F.2d 886 [found probable cause only because suspect's getaway car, still warm, was parked near his home and door was seen to open and close]; *State* v. *Peacher* (W.Va. 1981) 280 S.E.2d 559 [no probable cause even though air conditioner on in suspect's locked house trailer]; and *People* v. *Briscoe* (1974) 51 Mich.App. 153 [214 N.W.2d 877]. See generally, La Fave, Search and Seizure, *supra,* § 6.1, and cases cited therein.) On the other hand, one commentator observed in the mid-1970's that cases "allow the intrusion [into a suspect's home] when . . . officers do not have probable cause to believe the suspect is at home at the time and . . . even when the police have reason to think that the suspect is not at home." (Rotenberg & Tanzer, *Searching for the Person to be Seized* (1974) 35 Ohio St.L.J. 56, 67.)

At this point, it remains uncertain whether pursuing officers may enter a suspect's home without a *full measure* of "probable cause" to believe he is present. But in California and under recent United States Supreme Court authority there is no doubt they must possess some quantum of evidence on this question. Conceivably, it may be less than "probable cause," but it is at least an objective standard requiring the officers have enough to reasonably infer the suspect is at home.

At a minimum, the officers in the instant case were governed by the federal standard articulated in *Payton* v. *New York, supra,* 445 U.S. 573, which only sanctions entry of "a dwelling in which the suspect lives when there is *reason to believe* the suspect is within."[2] Meanwhile an oft-cited

---

[2]Even the three dissenters in *Payton* (White, J., Burger, C. J. and Rehnquist, J.) endorsed this requirement, saying "the officer entering to arrest must have reasonable grounds to believe, not only that the arrestee has committed a crime, but also that the person suspected is present in the house at the time of the entry." (445 U.S. at p. 616 [63 L.Ed.2d at p. 669].)

The language used in this dissent also illustrates why it is so unclear what quantum of evidence the courts require officers to possess as to the suspect's location. Here the justices use the very same verbal formula—"reasonable grounds to believe"—when describing what officers must know about the arrestee's commission of the crime as when describing that they must know about his presence in the house. Clearly, police may not enter to arrest without a full measure of "probable cause" that an "arrestee committed a crime." So "reasonable grounds to believe" has to equate with "probable cause" in reference to that clause of the sentence. As a matter of grammar and logic, it is difficult to argue the very same four words in the very same sentence mean something less than "probable cause" as applied to the clause relating to the suspect's presence in the house.

It is conceivable the majority likewise meant to impose a full "probable cause" requirement when it used the "reason to believe" language quoted in the text. A leading commentator, however, speculates the court had another purpose: "Though this cautious language may only reflect the fact that the Court had no occasion to explore further the grounds-for-entry issue, the matter may well have been stated in this way so as not to encourage lower courts to adopt a hard-nosed 'probable cause to believe the suspect is at home' test . . . ." (La Fave, Search and Seizure (*supra,* 1986 pocket supp.) p. 147.)

circuit court opinion has phrased a standard in language which differs both from the traditional "probable cause" formula and the *Payton* decisions "reason to believe." It would sanction entries to find a fleeing suspect only where the officers have "*strong reason* to believe that the suspect is in the premises being entered." (*Dorman* v. *United States* (1970) 140 App.D.C. 313 [435 F.2d 385, 393].)

The California Supreme Court cases do not appear at odds with the United States Supreme Court's formulation in *Payton.* They likewise establish a "reasonable belief" standard and likewise leave open the question whether this means a full measure of "probable cause" or something less.

California's "reasonable belief" standard was announced in two "hot pursuit" cases—*People* v. *Gilbert, supra,* 63 Cal.2d 690 and *People* v. *Smith, supra,* 63 Cal.2d 779—and reinforced in a more recent one, *People* v. *Escudero, supra,* 23 Cal.3d 800.

In neither *Gilbert* nor *Smith* had the officers followed the suspects to their residence. Nonetheless the Supreme Court held in the circumstances of those cases it was "*not unreasonable* for the police to *assume* that the [suspect] might be on the premises" (court's characterization of *Gilbert*[3] in *People* v. *Escudero, supra,* 23 Cal.3d at p. 809, italics added) and "*reasonable* for the police to *believe* [the suspect] might stop at his house before

---

[3]Although the *Gilbert* court spoke of the reasonability of the officer's "assumption" it is apparent the justices were referring to an inference from known and quite specific facts not a hypothesis drawn from thin air. In this case, the officers who made the warrantless entry learned of the defendant's address from a codefendant. They also were told over the car radio that two robbers had escaped in the same automobile. When they arrived at the defendant's apartment house they were told one of the two men who had rented the unit the day before had just left. The officers obtained a key and entered the apartment. No one was there, but they found several items of evidence which were admitted at trial. The Supreme Court quoted from the testimony of the FBI agent who led the entry. "'[W]e knew . . . there were three robbers. One was wounded and accounted for, one had just left a few minutes before, and there was a third unaccounted for. *Presumably* he was in the apartment.'" (*People* v. *Gilbert, supra,* 63 Cal.2d 690, 707, italics added.) In the very next sentence, the court explained in the following language why the officers had "presumed" reasonably even though it turned out the defendant was not there. "Since the officers were in fresh pursuit of two robbers who escaped in the same automobile, agent Schlatter's *assumption* was not unreasonable." (*Ibid.,* italics added.) In the next paragraph of the opinion the court contrasts these facts with *Stoner* v. *California* (1964) 376 U.S. 483 [11 L.Ed.2d 856, 34 S.Ct. 889] where a warrantless entry had been disapproved by the United States Supreme Court. In doing so, it applied a "reasonable belief" standard. "[The officers] had *no reason to believe* that the defendant was in his room, for his key was in his mailbox at the hotel desk." (*Ibid.,* italics added.) In these circumstances we do not find the California Supreme Court articulated a standard less than "reasonable belief" when it used the phrase "reasonable assumption" in *Gilbert.*

continuing his flight, to obtain clothes, money, or ammunition" (court's characterization of *Smith*[4] in *id.*, at p. 810, italics added).[5]

These "assumptions" and "beliefs" *appear* to be something less than the detailed, specific evidence of who did what to whom and what is located where which the courts define as the "probable cause" they require before approving a warrant to search premises for something. On the other hand, it is conceivable the California Supreme Court did not mean to imply officers can proceed with less than "probable cause to believe the suspect is at home" when they pointed out the reasonability of the officers' belief in *Smith* and the reasonability of their "assumption" in *Gilbert*. In other circumstances, the court has been very careful to announce when it was deviating from the traditional "probable cause" standard. For instance, when the court decided officers should be able to detain suspects temporarily on less evidence than the full "probable cause" required to arrest it did not do so by offhandedly using the phrase "reasonable suspicion" in lieu of the phrase "probable cause." Instead the court stressed it was articulating a new and lower evidentiary standard. "[C]ircumstances short of probable cause to make an arrest may still justify an officer's stopping pedestrians or motorists on the street for questioning." (*People* v. *Mickelson* (1963) 59 Cal.2d 448, 450 [30 Cal.Rptr. 18, 380 P.2d 658]; see also *In re Tony C.* (1978) 21 Cal.3d 888 [148 Cal.Rptr. 366, 582 P.2d 957].) In contrast, neither *Gilbert, Smith* nor *Escudero* expressly purported to authorize "hot pursuit" entries on less than "probable cause" to believe the suspect had fled within the premises to be searched.

Nonetheless, for purposes of this opinion we assume the officers were not required to possess a full measure of probable cause to believe White

---

[4]In *Smith* the officers apprehended defendant's live-in girlfriend and accomplice at the scene after he had fled. The two had been attempting to pass some forged company checks. They were detected unexpectedly. The defendant pulled a gun and killed two officers, wounded another officer and a store employee. Investigating officers found the accomplice's address on a driver's license in her purse. She told the officers she shared this house with the defendant. She said she supposed he would return to this address. "His clothes are there." She also gave them permission to enter the house. The California Supreme Court approved the officers subsequent entry of the house defendant and his accomplice shared on two grounds. First, "[i]t was reasonable . . . to believe he might stop at his house before continuing his flight, to obtain clothes, money, or ammunition." (*People* v. *Smith, supra,* 63 Cal.2d 779, 797.) Secondly, "[t]aken as a whole, the record supports the . . . conclusion that '. . . [defendant's accomplice] gave consent to the entry' . . . ." (63 Cal.2d at p. 799.) Accordingly, in this case at the time of the entry officers had affirmative evidence in the form of an accomplice's testimony that defendant probably was present at his home as well as normal expectations he might flee in that direction.

[5]It should be noted these reasonable "assumptions" and "beliefs" were not borne out. In both *Gilbert* and *Smith* the suspects' residences proved to be unoccupied. Nonetheless, the Supreme Court upheld the entries and allowed admission of the evidence the police discovered as a result of these entries.

was located in his residence. We construe the *Gilbert, Smith,* and *Escudero* opinions to mean it at least had to be "reasonable" for them to "believe" he was there. Applying this standard to the facts of this case, we find the entry of White's residence was not justified as a legitimate part of the officers' hot pursuit of this fleeing felon. Here, unlike *Smith* and *Gilbert* the officers possessed specific information appellant had fled *away* from his house.

While the officers in these prior cases were not certain of the suspects' actual location, they at least were acting in a way which was consistent with common assumptions about human nature. In the absence of knowledge about where the suspect had fled it was reasonable to believe he would go home either to hide or as the *Smith* court suggested to replenish his supplies of clothing, money and ammunition. Furthermore, in both cases the officers had other information supporting the conclusion the suspect had gone to his home. But general assumptions about human nature which are reasonable in a vacuum of information can become unreasonable if not downright absurd when you learn the facts of a given case. It may be reasonable to assume men are taller than women, but when you see a six-foot woman next to a five-foot three-inch man it is not reasonable to say he is taller than she.

Thus, in the instant case it might have been reasonable for the officers to believe the appellant was in his home if the victim had merely told them he had raped her there an hour or so earlier. But she went further. She said he had left the house in a specific car which she also described. So the officers knew he had departed his house a short time earlier. Moreover, when they arrived at the house they did not see any car fitting the victim's description anywhere in the vicinity. Hence there was little chance he had returned. At this point, any "belief" White could be found in his house was more in the nature of wild speculation. It certainly was far below the standard of a "*reasonable* belief" the United States and California Supreme Courts require before officers may enter a suspect's residence in a "hot pursuit" situation or otherwise.

III. THE ADMISSION OF THE EVIDENCE THE OFFICERS OBTAINED DURING THEIR UNLAWFUL ENTRY WAS PREJUDICIAL ERROR UNDER THE CHAPMAN STANDARD

We find the officers violated the Fourth Amendment when they entered appellant's residence without a warrant. Accordingly, we hold the trial court erred in denying his motion to suppress the bloodstained sheets found in appellant's bedroom and the observations the officers made in the bedroom as a result of that entry.

We further hold this error requires reversal of White's conviction. The bloodstained sheets and observation which the trial court admitted into

evidence had been obtained in violation of the United States Constitution. When unconstitutionally obtained evidence is admitted at trial, *Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065] mandates reversal unless the appellate court can find beyond reasonable doubt the jury would not have reached a verdict more favorable to appellant had the court excluded the tainted evidence.

This case turned on a credibility contest between victim and defendant. The victim claimed she was beaten by White when he raped her in his bedroom. He claimed she was beaten by her boyfriend—or at least that she told him this story. The bloodstained sheets found in White's bedroom obviously lent support to the victim's version. We cannot say beyond a reasonable doubt the jury necessarily would have believed the victim over White in the absence of this vital piece of corroborative evidence. Hence we must reverse the conviction as well.[6]

## CONCLUSION

Writing for a unanimous court in *Escudero*, Justice Mosk issued a strong warning. "As with all exceptions to the warrant requirement, the courts must ever be on their guard to keep the 'hot pursuit' justification within firm and narrow bounds: 'the exception must not be permitted to swallow the rule' [citation omitted]." (*People* v. *Escudero, supra,* 23 Cal.3d 800, 811.) To endorse the entry of appellant's dwelling in this case would, we fear, not just stretch those "firm and narrow bounds" but burst them apart. Here the officers had no reason whatsoever to believe the suspect was in his home but instead had good reason to believe he was *not* there. Yet they barged in. If we were to sanction warrantless entries under these circumstances we would be declaring open season on suspects' homes during the hour or two after a crime is committed. This would create an exception which might not swallow the warrant requirement whole but certainly would take an enormous bite out of that rule.

---

[6]The People argue admission of the bloodstained sheets was not prejudicial because at trial the defense attempted to provide an innocent explanation for the stains. It is true White testified the blood rubbed off from the wounds Ms. C. brought to the bed as a result of the fight with her boyfriend not from any beating he administered. But merely because a defendant attempts to explain away some improperly admitted physical evidence does not make admission of this illegally obtained evidence nonprejudicial. It is as if in a prosecution for possession of narcotics the trial court admitted drugs which had been illegally seized from the defendant's automobile and at trial the defendant testified the drugs were not his and he did not know they were in his car. Admission of this illegally obtained evidence obviously would be prejudicial despite the defendant's innocent explanation since if the drugs were suppressed he would not have had to give any explanation. Similarly, in the instant case, if the court had ruled correctly White would not have had to explain away the bloodstained sheets which—like the drugs in our hypothetical—appeared to point toward his guilt. The same reasoning applies to the defendant's attempt to explain away the officer's observation about the absence of a PCP odor in White's bedroom.

## DISPOSITION

The judgment is reversed and remanded with instructions the trial court grant appellant's motion to suppress and for further proceedings consistent with this opinion. The habeas corpus is denied.

Lillie, P. J., and Thompson, J., concurred.