[No. 23281–9–I.   Division One.   May 14, 1990.]

THE STATE OF WASHINGTON, *Respondent,* v. ANTONIO
M. BARBOZA, *Appellant.*

*Eric Broman* of *Washington Appellate Defender Association,* for appellant.

*Michael E. Rickert, Prosecuting Attorney,* for respondent.

SCHOLFIELD, J.—Antonio M. Barboza appeals his conviction for possession of a controlled substance with intent to manufacture or deliver. We affirm.

## FACTS

On September 13, 1988, at about 11:30 a.m., Officer Don McDermott received a report over his radio that there was a hysterical woman at the Big Lake grocery who had stated that gunshots had been fired at her residence. A few minutes later, the radio reported that possibly a kidnapping had occurred.

When McDermott first arrived, Officer Marlow was talking to Laura Barboza in the driveway. She was very upset and stated that shots had been fired in a vehicle. Marlow told McDermott that Barboza's husband had possibly been taken at gunpoint. McDermott was concerned for his own safety and Marlow's, so he told Marlow to take cover. McDermott took cover behind one of the vehicles. He noticed a bullet hole in the car.

Soon four or five other deputies arrived and were deployed as follows: When Deputy Mullen had a backup cover, McDermott motioned to him to move up toward the corner of the house where McDermott was. Marlow remained behind the car. Garrison covered from a tree in the front yard. Chief Panzero and Chief Talbott both had positions at the driveway.

McDermott and Mullen tried to look through windows of the house to see if they could see anybody moving. They saw no one. McDermott pushed open a door, and they began a room–by–room search. They wanted to check to

make sure that there was no armed suspect nor any wounded person in the house. They did not find anyone in the house. However, they did find a marijuana–growing operation.

Prior to going into the house, the officers heard Laura Barboza say there was no one in the house and that someone had taken her husband away in a car. She told them not to go into the house. While McDermott and Mullen were in the house, Chief Panzero talked to Laura Barboza, trying to get information from her and trying to keep her from entering the house until it was safe.

Laura Barboza ran into the house, and Panzero followed her inside. Upon being told by McDermott and Mullen that they had found a growing operation inside, Panzero told them to quickly search upstairs to make sure there was nobody up there and then to get outside of the house. He read Laura Barboza her rights.

Antonio Barboza was charged by information filed September 26, 1988, with possession of a controlled substance with intent to manufacture or deliver. On October 21, 1988, Barboza moved the trial court, pursuant to CrR 3.6, to suppress evidence discovered during a warrantless search of his home and seized thereafter. After an evidentiary hearing held October 27, 1988, the trial court denied his motion. Findings of fact and conclusions of law were entered April 10, 1989. The trial court concluded that when the officers arrived, there was an emergency that imperiled the safety of the people involved and called for immediate action. The emergency constituted an exigent circumstance that permitted the officers' entry into the house.

Following the trial court's denial of his suppression motion, Barboza stipulated to the admissibility of the police reports of the incident, and the court found him guilty as charged. This appeal timely followed.

### Exigent Circumstances

Barboza argues that the search of his home was not justified by exigent circumstances or any other exception to

the warrant requirement, and thus, any evidence discovered should have been suppressed.

A warrantless search of a residence is per se unreasonable under the fourth amendment to the United States Constitution and Const. art. 1, § 7, unless it falls within "'a few specifically established and well–delineated exceptions.'" *State v. Chrisman,* 100 Wn.2d 814, 817, 676 P.2d 419 (1984) (quoting *Katz v. United States,* 389 U.S. 347, 357, 19 L. Ed. 2d 576, 88 S. Ct. 507 (1967)). There must be a showing by those who seek exemption that the exigencies of the situation made that course imperative. *State v. Bean,* 89 Wn.2d 467, 472, 572 P.2d 1102 (1978). The burden is on those seeking the exemption to show the need for it. *State v. Sanders,* 8 Wn. App. 306, 310, 506 P.2d 892 (1973).

An emergency situation can justify a warrantless search. *State v. Raines,* 55 Wn. App. 459, 463, 778 P.2d 538 (1989). For instance, when premises contain persons in imminent danger of death or harm or information that will disclose the location of a threatened victim or the existence of such threat, police may search those premises without first obtaining a warrant. *State v. Raines, supra* at 463–64 (citing *State v. Lynd,* 54 Wn. App. 18, 20, 771 P.2d 770 (1989)). A warrantless search is also reasonable if necessary for the safety of the public and officers. *State v. McAlpin,* 36 Wn. App. 707, 716–18, 677 P.2d 185, *review denied,* 102 Wn.2d 1011 (1984).

For a search to come within the emergency exception, we must find that the search was "'actually motivated by a perceived need to render aid or assistance.'" *State v. Raines, supra* at 464 (quoting *State v. Loewen,* 97 Wn.2d 562, 568, 647 P.2d 489 (1982)).[1] Accordingly, the State must show that: (1) the searching officer subjectively believed an emergency existed; and (2) a reasonable person

---

[1] While *Loewen* applied to a medical emergency, we perceive no difference between a medical emergency and some other emergency involving threats to persons. *See State v. McAlpin, supra.*

in the same circumstances would have thought an emergency existed. *State v. Raines, supra; State v. Loewen, supra* at 568; *State v. McAlpin, supra* at 716.

The determination of whether an emergency justifies a warrantless search must be based on the individual facts of each case. *State v. Raines, supra; State v. Lynd, supra* at 22. "'Whether a police officer's acts in the face of a perceived emergency were objectively reasonable is a matter to be evaluated in relation to the scene as it reasonably appeared to the officer at the time'." *State v. Raines, supra* at 464 (quoting *State v. Lynd, supra* at 22; citing *State v. Bakke*, 44 Wn. App. 830, 837, 723 P.2d 534 (1986), *review denied*, 107 Wn.2d 1033 (1987)).

In *State v. Nichols*, 20 Wn. App. 462, 581 P.2d 1371 (1978), police officers responded to radio notification of a fight in progress. The complainant informed the officers that six to eight people armed with beer bottles and chains were involved, but had departed a minute or two before the police arrived. The informant said one of the participants lived at the other end of the alley, and some of the bottles involved were reportedly filled with gasoline. The officers went to the vicinity of the house and garage where the fight allegedly occurred and began an investigation. They knocked on the door of the house, but received no response. Seeking other possible participants, injured people, or people who might be hiding for one reason or another, they approached a garage near the house. A door to the garage was open; the officers entered and checked the area, finding in their search a car that they later learned had been reported stolen. *State v. Nichols, supra* at 464–65.

The appellate court held that in conducting their investigation to determine whether anyone had been injured, the officers acted reasonably by entering the garage adjacent to the location of the fight. The court said they had reasonable grounds to believe their assistance was necessary for the protection of life; that the purpose of the search was not to arrest or seize evidence; and there was probable cause to

associate the garage with the emergency. *State v. Nichols, supra* at 466.

Similarly, in *United States v. Herndon,* 390 F. Supp. 1017 (S.D. Fla. 1975), police were dispatched to a house and barn, the scene of a reported shooting incident. In response to a tip from an unidentified person, Officers Charter and Dwyer proceeded to an intersection and approached an alleged participant, Jones. Jones' auto was parked approximately 200 yards from the rear of the subject barn. During the officers' conversation with Jones, another person approached the officers and informed them that Jones resided at the scene and was a participant in the shots fired. Officer Dwyer proceeded to Jones' barn and house, while Officer Charter remained with Jones. Several more neighbors told Dwyer they had seen three males leave the barn, one entering his auto and driving to the road in front of the house, the other two leaving the house, at which time shots were fired in the immediate area. *United States v. Herndon, supra* at 1018.

Dwyer approached the house, looked in the window, and entered through the partially open door. He testified that he entered the house and, subsequently, the barn, to look for injured persons or additional witnesses in connection with the shooting investigation. Officer Charter joined him, and they proceeded to investigate the barn, entering through a partially open door. Inside, they came upon an illegal still. *United States v. Herndon, supra* at 1018.

The court found the officers' search was permissible, based upon the exigent circumstances of looking for victims of a shooting incident. The court reasoned that witnesses had heard shots and seen three men running in the vicinity of the house and barn; therefore, it was logical and prudent for the officers to consider that there might be someone injured and in need of help in the house or barn. *United States v. Herndon, supra* at 1020. The court further stated that it would be senseless to expect police officers to obtain a warrant before answering the dispatch call, or, once on

the scene, before entering the buildings. "Clearly, in matters involving possible injury by gun shot, time is of the essence." *United States v. Herndon, supra* at 1020.

In the present case, although the officers had no specific evidence or reason to believe that someone might be concealed in the house or that a wounded person might be in the house, nevertheless, under all the circumstances, the entry into the house without a search warrant was justified on the basis of exigent circumstances. The officers received a complaint of shots being fired and were met by Laura Barboza, who was upset and crying. She said there had been a shooting and that someone had taken her husband away in a car. They saw a bullet hole in a car parked within several feet of the home. Based on these facts, it was reasonable for the officers to consider that there might have been someone injured in the house or that an armed assailant may have been hiding there. In addition, it is undisputed that the search was not primarily motivated by an intent to arrest and seize evidence. Finally, the radio dispatch directing the officers to the address of the Barboza house, as well as the bullet hole in the car parked within feet from the house, provided a reasonable basis to associate the emergency with the Barboza house.

During oral argument, defense counsel contended that since Laura Barboza had told the police that there were only three people involved and that she had seen them all leave, there was absolutely no basis for the officers to even suspect that a person might remain in the home. However, Laura Barboza testified that people entered the home and that she did not know how many entered. She did see three people leave. Nevertheless, it is unclear how much of this was known to the officers. However, it is clear that Laura Barboza was very excited, frightened, and was not in a position, based on her own personal knowledge, to assure the officers that there was not a fourth or fifth person remaining in the house. Under circumstances where gunshots have been fired and a person has been apparently abducted, common sense dictates that the officers should

check the home for the presence of hostile people, or possibly a wounded person, before leaving the premises.

Barboza argues that the acts of the officers show that they did not subjectively believe that anyone was injured inside the house or that entry was necessary to protect themselves and others from an armed suspect. In determining whether the searching officer subjectively believed an emergency existed, the court may examine whether the officer's acts were consistent with his or her claimed motivation. *State v. Downey,* 53 Wn. App. 543, 545, 768 P.2d 502 (1989). In the present case, the officers took cover, approached the house and looked through windows to see if anybody was moving, then did a room–by–room search of the house. The officers' actions of looking inside windows, coupled with their hasty entry into the house and a limited room–by–room search, are consistent with a subjective belief that an injured person could be inside the house. These acts, however, are less consistent with a belief that an armed person could be in the house because looking through windows could be dangerous where there is an armed suspect inside. The officers also did not attempt verbal contact with anyone inside, and they entered without orders from a superior officer or obtaining a floor plan of the house. Nevertheless, the officers' cautionary acts of taking cover behind the car and trees and the limited room–by–room search are consistent with a belief that an armed suspect may be in the house.

Barboza cites *State v. Terrovona,* 105 Wn.2d 632, 716 P.2d 295 (1986) in support of his argument that there has not been a sufficient showing of exigent circumstances in the present case. In *Terrovona,* after the defendant's stepfather was found murdered, the police did not seek a warrant before entering the defendant's house and arresting him. In deciding that entry into the house without a warrant was justified, the trial court applied six elements enumerated in *Dorman v. United States,* 435 F.2d 385 (D.C. Cir. 1970):

*Dorman* enumerates six elements to aid in determining when a warrantless police entry into a home is justified: (1) a grave offense, particularly a crime of violence, is involved; (2) the suspect is reasonably believed to be armed; (3) there is reasonably trustworthy information that the suspect is guilty; (4) there is strong reason to believe that the suspect is on the premises; (5) the suspect is likely to escape if not swiftly apprehended; and (6) the entry is made peaceably.

*State v. Terrovona, supra* at 644 (citing *Dorman v. United States, supra* at 392–93).

Barboza argues that because the above six elements are not met in the present case, the entry was unjustified. However, the *Dorman* factors apply to entries made to effect an arrest, such as in a situation of "hot pursuit." *See Dorman v. United States, supra; State v. Terrovona, supra.* The present case, on the other hand, involves entry made to rescue any injured persons and for the safety of the public and police. Thus, a failure to satisfy the *Dorman* factors does not mean the entry was unjustified.

Barboza also cites *In re White,* 183 Cal. App. 3d 1199, 228 Cal. Rptr. 672 (1986) in support of his argument that the entry was unlawful. In *White,* a rape victim called a police officer to the defendant's house, the scene of the rape. The officer heard the victim say that the defendant had raped her in the house, but that the defendant had driven away from the house in his car. The officer nonetheless entered the house without a warrant, and searched it. *In re White, supra* at 1202.

In *White,* the appellate court refused to uphold the search on the grounds that the officer had specific information from the victim that the defendant had fled from his house. Thus, the officer could not have had a reasonable belief that the defendant was at home. *In re White, supra* at 1209.

*White* may be distinguished from the present case. The exception invoked in *White* was "hot pursuit," in which the justification of the search is to find the suspect and arrest him before a delay results in a problem such as the suspect's escape or destruction of evidence. In *White,* there

was no reason to believe the suspect was in his home, and thus, there was no justification for the search.

In contrast, in the present case the exception invoked was the emergency doctrine. The objective was not to make an arrest, as in *White,* but to make sure no one had been shot and that no assailant was in the house. Although Laura Barboza told them no one was in the house, the officers were justified in checking it anyway because she may have been upset and confused, or there may have been someone there unbeknownst to her. Police officers are not required to base their decisions entirely on statements made by witnesses at the scene, particularly in situations involving gunshots where time may be of the essence and carelessness on the part of the officer might impair the safety of themselves or someone else.

Accordingly, we find that the trial court properly denied the motion to suppress.

Judgment affirmed.

WEBSTER and BAKER, JJ., concur.

Review denied at 115 Wn.2d 1014 (1990).